**Douglas M. GRIMES, et al.,
Plaintiffs-Appellants,**

v.

**William (Bill) SMITH, Jr., et al.,
Defendants-Appellees.**

No. 84–1924.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1985.

Decided Nov. 12, 1985.

As Corrected Nov. 26, 1985.

---

Jerald S. Meacham, Grimes & Meacham, Gary, Ind., for plaintiffs-appellants.

Rick A. Gikas, Crown Point, Ind., for defendants-appellees.

Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

ESCHBACH, Circuit Judge.

The primary question presented in this appeal is whether proof of a wholly non-racial but politically motivated conspiracy among private parties to mislead voters in a city primary election establishes a right to relief under 42 U.S.C. § 1985(3). The district court held that it did not and, for the reasons stated below, we will affirm.

## I

The facts of this case, which are not in dispute,[1] are set forth in the district court's opinion, 585 F.Supp. 1084 (in which it ruled on the post-verdict motions), as follows:

In Gary, winning the Democratic primary is tantamount to winning the general election. [In 1983] the Democratic primary was held on May 3. The major offices at stake were Mayor, City Clerk, and City Judge. The favorites in these races, all incumbents, were Richard Hatcher, for Mayor; Barbara Wesson, for City Clerk; and Douglas Grimes, for City Judge. Mayor Hatcher is the long-time Mayor of Gary, and the ticket of Hatcher, Wesson, and Grimes was the Administration ticket. But there were other candidates in each of these races. Entering the voting booth, a voter interested in just these three offices would have seen, reading from left to right on the voting machine, a row with 10 names in it, in groups of three, four, and three, each group being under the name of an office (in order, Mayor, City Clerk, and City Judge). To the right of all these names were the names of candidates in aldermanic races. The first three names on the ballot—Thomas Crump, Robert Gordon, and Richard Gordon Hatcher—were the candidates for Mayor. The next four—Kenneth S. Bass, John Damian, John A. Grimes, and Barbara Leek Wesson—were the candidates for City Clerk. And the next three—Lloyd Buford Fisher, Charles H. Graddick, and Douglas H. Grimes—were the candidates for City Judge. In the Mayor's race the "serious" candidates were Crump and Hatcher. They got 23,150 and 27,835 votes respectively, and the third candidate got 1,217. In the City Clerk's race Miss Wesson was the only serious candidate, and she got 26,069 votes. Bass and Damian got 3,343 and 4,192 votes respectively, and John Grimes a surprising 8,957. In the City Judge's race Douglas Grimes and Graddick were the serious candidates, and they got 19,373 and 22,174 votes respectively, and the third candidate 3,285. Graddick went on to win the general election (as did the other Democratic nominees), and he took office on January 1, 1984. Douglas Grimes brought this lawsuit shortly after the primary election and asked for a preliminary injunction to prevent Graddick from running in the general election as the Democratic nominee for City

[1]. The district court in its post-trial ruling describes as facts the evidence presented to the jury. Both the plaintiffs and the defendants were allowed to present evidence, and neither side now challenges the factual findings of the trial judge. In fact, both sides adopted the findings of the district court as the statement of facts in their respective briefs. See Appellants' Brief at 7–13; Appellees' Brief at 11. Neither side saw fit to have the trial transcripts transmitted as part of the appellate record. We have, therefore, reproduced, rather than paraphrased or cited to, the findings of the district court in the interests of accuracy, as well as convenience for the reader.

Judge; but this was denied and the matter was set for trial on the merits.

Although John Grimes did not win the City Clerk's race, the fact that this political unknown who had done no significant campaigning got almost 9,000 votes was surprising. And since he had the same last name as Douglas Grimes, and Douglas Grimes, also contrary to expectations, lost the election for City Judge, Douglas Grimes suspected foul play and began to investigate. The investigation revealed that John Grimes (who is now 43 years old) had been at the time of the campaign and election an unemployed carpenter, almost blind as a result of glaucoma, with little education, no steady source of income (although he picked up a few dollars a week doing handyman work for his landlord, and now receives social security disability benefits), and no previous involvement in politics. He had never in his life voted in a primary or general election, and did not vote in the March 1983 primary in which he was a candidate. He has never had the faintest idea of the duties of a City Clerk. It is evident, and no one denies, that John Grimes did not stand for election to this post on his own initiative. He was put up by somebody; the question is by whom.

Defendant Michael Brown, an unemployed 27-year-old, testified that he decided to get into politics by managing someone's campaign. He knew John Grimes, though not well; and he testified that he thought that Grimes would be a good candidate for City Clerk in the May 1983 primary. He was unable to give any explanation of why he thought so, beyond remarking that he didn't think Grimes' handicap should be disqualifying. The deadline for filing as a candidate for the May primary was noon on March 4. Brown testified that he borrowed a car and drove John Grimes to the place for filing. He testified that he knew that a candidate had to be a registered voter, and learned somehow that Grimes was not registered, so the first thing they did when they arrived was to have Grimes register. He did so and then signed the filing form, which was time-stamped 11:59 a.m. on March 4.

Grimes and Brown then went their separate ways. Both testified that they campaigned for Grimes' election, but admitted that their campaigning was limited to sporadic personal canvassing in their respective neighborhoods. Brown's campaigning did not go beyond buying an occasional drink for an acquaintance in the bars that he frequented, and urging them to vote for Grimes. There were no campaign rallies or speeches, campaign leaflets, or billboards or other advertising; there were no campaign workers. The campaign expenditure form that Grimes filed after the election disclosed expenditures of zero.

John Grimes and Michael Brown were connected to the other defendants—who are, besides Judge Graddick, his campaign manager Bill Smith and his campaign coordinator Bob Lacy—in several ways. Grimes and Smith have known each other for many years. Grimes has a daughter by Smith's sister, and Grimes and Smith regard each other like the brothers-in-law they would be if Grimes had married Smith's sister. Grimes also has known Lacy and Lacy's wife well for many years. Brown is a friend of Smith—a particularly good friend—and of Lacy, and he worked under Lacy in the Graddick campaign, in security, until he began managing John Grimes' "campaign"; and there was testimony that he continued working in the Graddick campaign for a short time after he became Grimes' campaign manager. Grimes encountered both Smith and Lacy several times during the campaign, and afterward Grimes asked Smith to give him a ride to Grimes' lawyer's office so that he could get help with his campaign expenditure form, and Smith obliged him.

As part of his investigation of the election outcome, Douglas Grimes went looking for John Grimes to talk to him about the results, and one of John Grimes' sisters, Betty Grimes, according to her testimony, called Bob Lacy to find out what she should do. When she looked in the phone book (apparently referring to a personal book of phone numbers rather than a tele-

phone directory), Bob Lacy's name "just fell out," and she called him. He denied that she had called him but the jury was entitled to disbelieve his denial, especially since Betty Grimes was a friendly witness to her brother and the other defendants. Also after the election, a journalist tried to interview John Grimes (the "mystery Grimes" as he was then called, because he had done so well in the election yet no one had heard of him) in a parking lot. The journalist testified that when he insinuated laughingly that Grimes had been put up to run for City Clerk in order to help Graddick's campaign against Douglas Grimes, Brown, after a moment's hesitation, joined in the laughter. Finally, John Grimes' bank book, which was put into evidence, showed two deposits totaling $700 in mid-March, which was six weeks before he began receiving social security disability benefits. He was unable to account convincingly for these receipts. In fact, he denied having received this money, despite what the bank book (which he acknowledged was his) showed.

Although there was no direct evidence that Graddick's campaign directors, Smith and Lacy, put up Grimes to run for City Clerk, the circumstantial evidence reviewed above provided an adequate basis for the jury to infer that they did so—both of them; for the jury was entitled to find that Smith and Lacy, in view of their acquaintance with Grimes, must have discussed the matter with each other. The jury was also justified in finding that Graddick had not joined the conspiracy. Although Smith and Lacy testified that they discussed all strategy matters with Graddick, the jury was not required to believe that, or indeed any, part of their testimony. Graddick testified in his own behalf and the jury may have believed that he did not know about the scheme, and was not the kind of man to engage in such tricks. Whether the jury was right or wrong, there was no inconsistency in its exonerating Graddick but finding that the other four defendants were participants in the conspiracy.

As to the effects of the conspiracy: lay and expert testimony established a reasonable probability that many people, enough to swing the election to Graddick, voted for John Grimes (whose name appeared before Douglas Grimes' on the ballot, reading from left to right) thinking they were voting for Douglas Grimes. Douglas Grimes' co-plaintiffs so testified, as did another voter in the May primary. And assisted by testimony of the plaintiffs' well-qualified expert witness, Dr. Gerald Wright, a political scientist who teaches at the University of Indiana [sic] at Bloomington, the jury was entitled to conclude that the confused voters who testified were typical of many Gary voters. Granted, the evidence regarding the effects of the conspiracy was not entirely satisfactory. The plaintiffs actually presented two inconsistent theories of how the voters were confused. The lay witnesses testified that they voted for John thinking that he was Douglas, and did not vote in the City Judge's race at all; the expert speculated that voters who voted for John thinking that he was Douglas went on and voted for Graddick in the City Judge's race because they recognized his name. The lay witnesses' theory seems the more plausible but is inconsistent with the heavy turnout in the City Judge's race. Their testimony would lead one to expect that the turnout should have been very light because thousands did not vote in the race at all, thinking that they had already voted in that race when they pulled the lever for John Grimes. But no plausible alternative to confusion was advanced that could explain how John Grimes, without campaigning, managed to get several thousand votes more than the other token candidates in the Clerk's race—both of whom did more campaigning than John Grimes.

585 F.Supp. at 1086–88.

The court also stated that "[b]oth Douglas Grimes and Charles Graddick, and also their respective supporters, are black, which is not significant in itself but only as

showing that they are of the same race."
*Id.* at 1090.[2]

■ The plaintiffs initiated this action under § 1985(3)[3] and alleged that the defendants conspired to defraud the plaintiffs of their constitutional rights to participate in electoral politics.[4] The plaintiffs sought damages and equitable relief. At the end of a six-day trial, the jury returned verdicts in favor of the plaintiffs and against all remaining defendants with the exception of Graddick. In ruling on the post-verdict motions, the trial court held that it was not unreasonable for the jury to find that the defendants conspired to mislead voters in the May primary and that the defendants succeeded to the extent of probably affecting the outcome of the City Judge's race. Thus, the verdict would not be overturned for lack of sufficient evidence. However, the court concluded that "purely private, purely political conspiracies" did not constitute a claim under § 1985(3) and, therefore, granted the defendants' motion for judgment notwithstanding the verdict. This appeal followed.

**II**

■ As construed by the Supreme Court, § 1985(3) requires that the plaintiff allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983).

Section 1985(3) was enacted as part of § 2 of the so-called "Ku Klux Klan Act of 1871."[5] The statute was the congressional response to the illegal activities of certain groups in the South during the Reconstruction era.[6] Nonetheless, the statute lay dormant for many years,[7] and Supreme Court decisions construing the enactment have

---

2. It should also be noted that the plaintiffs and the defendants have the same formal political-party affiliation, i.e., Democratic.

3. 42 U.S.C. § 1985(3) provides:
 If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of hav-

ing and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

4. The plaintiffs also sought recovery under 42 U.S.C. §§ 1983 and 1986. The § 1983 claim was dismissed, however, and the plaintiffs have not appealed the dismissal. In addition, liability under § 1986 is derivative of § 1985(3) liability; without a violation of § 1985(3), there can be no violation of § 1986. *Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 203 (7th Cir. 1985); *D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474, 1485 n. 16 (7th Cir.1985).

5. The Act was originally entitled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes." Act of Apr. 20, 1871, ch. 22, 17 Stat. 13.

6. *See Harrison v. KVAT Food Management, Inc.,* 766 F.2d 155, 156–57 (4th Cir.1985).

7. One commentator has noted that no reported cases arose under § 1985(3) after its enactment in 1871 until 1920. Comment, 26 Ind.L.J. 361, 363 (1951).

been infrequent and episodic.[8] The lower courts have struggled to fill in the gaps, yet the scope of § 1985(3) could hardly be called clear.

For example, the Supreme Court's decision in *Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), was read to require that § 1985(3) reach only conspiracies involving state action.[9] Twenty years later, however, in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Court rejected this "artificially restrictive construction" of *Collins* and concluded that the texts of the statute and its companion provisions, along with the legislative history of the 1871 Act, all pointed "unwaveringly to § 1985(3)'s coverage of private conspiracies." 403 U.S. at 101, 91 S.Ct. at 1798. At issue in *Griffin* was an assault by a group of whites on a group of blacks who were traveling on an interstate highway in Mississippi. The attack was carried out because the whites mistakenly believed that the blacks were civil-rights workers. In considering the constitutional source of Congress's authority to proscribe the specific conspiracy alleged, the Court studiously avoided the classification of the substantive rights at issue in *Griffin* as Fourteenth Amendment rights, and stated that the allegations did not call for a determination of the powers accorded Congress under § 5 of that amendment. The Court instead relied on the rights of the Thirteenth Amendment and of interstate travel—rights that are assertable against wholly private, as well as governmental, interference. According to the Court, the conduct alleged was "so close to the core of the coverage intended by Congress that it is hard to conceive of wholly private con-

duct that would come within the statute if this does not." *Id.* at 103, 91 S.Ct. at 1799.

At the same time, however, the Court imposed an intent requirement:

> That the statute was meant to reach private action does not, however, mean that it was intended to apply to all tortious, conspiratorial interferences with the rights of others. For, though the supporters of the legislation insisted on coverage of private conspiracies, they were equally emphatic that they did not believe, in the words of Representative Cook, "that Congress has a right to punish an assault and battery when committed by two or more persons within a State." [citation omitted] The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. See the remarks of Representatives Willard and Shellabarger [quoted at 403 U.S. at 100, 91 S.Ct. at 1797]. The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

403 U.S. at 101–02, 91 S.Ct. at 1798 (emphasis in original) (footnote omitted) (quoted with approval in *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott*, 463 U.S. 825, 834–35, 103 S.Ct. 3352, 3359, 77 L.Ed.2d 1049

**8.** Prior to *Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), the Supreme Court had apparently decided only two cases under § 1985(3) (then codified at 8 U.S.C. § 47(3)). *See Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). In *United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966) and *United States v. Harris*, 106 (16 Otto) U.S. 629, 1

S.Ct. 601, 27 L.Ed. 290 (1883), the Court considered the criminal analogues to § 1985(3).

**9.** *See Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 371, 99 S.Ct. 2345, 2348, 60 L.Ed.2d 957 (1979); *Griffin v. Breckenridge*, 410 F.2d 817, 826–28 (5th Cir. 1969), *rev'd*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

(1983)). The Court also stated: "We need not decide, given the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985(3) before us. *Cf.* Cong. Globe, 42d Cong., 1st Sess., 567 (1871) (remarks of Sen. Edmunds)." *Id.* 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9. Thus, *Griffin* simultaneously expanded the scope of § 1985(3) to include certain private conspiracies and reduced it with a requirement of a "class-based, invidiously discriminatory animus."

Twelve years after *Griffin,* the Court began to define further the classes entitled to protection under the statute. *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), presented the question whether § 1985(3) applies to nonunion employees who were the victims of a conspiracy of union supporters. The Court identified three types of class-based animus that arguably come within the purview of the statute: racial, political, and economic.[10] In *Griffin,* it was made clear that racially motivated conspiracies were prohibited under § 1985(3). In *Scott,* it was determined that the provision did not reach conspiracies motivated by an economic or commercial bias; because the conspiracy at issue was motivated by economic or commercial concerns, no recovery was available for the plaintiffs. With reference to politically motivated conspiracies, the Court stated in *Scott:*

> [I]t is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans. The central theme of the bill's proponents was that the Klan and others were forcibly resisting efforts to emancipate Negroes and give them equal access to political power. The predominate pur-

pose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro. Although we have examined with some care the legislative history that has been marshaled in support of the position that Congress meant to forbid wholly nonracial, but politically motivated conspiracies, we find difficult the question whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means. To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings.

We realize that there is some legislative history to support the view that § 1985(3) has a broader reach. Senator Edmunds' statement on the floor of the Senate is the clearest expression of this view. He said that if a conspiracy were formed against a man "because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, ... then this section could reach it." Cong.Globe, 42d Cong., 1st Sess., 567 (1871). The provision that is now § 1985(3), however, originated in the House. The narrowing amendment, which changed § 1985(3) to its present form was proposed, debated, and adopted there, and the Senate made only techni-

---

**10.** It could also be argued that the Court's decision in *Great American Federal Savings & Loan Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), implicitly recognized that § 1985(3) could reach a conspiracy founded on a gender-based animus. *See id.* at 389 n. 6, 99 S.Ct. at 2357 n. 6 (White, J., dissenting).

cal changes to the bill. Senator Edmunds' views, since he managed the bill on the floor of the Senate, are not without weight. But we were aware of his views in *Griffin*, 403 U.S. at 102, n. 9, [91 S.Ct. at 1798 n. 9,] and still withheld judgment on the question whether § 1985(3), as enacted, went any farther than its central concern—combatting the violent and other efforts of the Klan and its allies to resist and to frustrate the intended affects [sic] of the Thirteenth, Fourteenth, and Fifteenth Amendments. Lacking other evidence of congressional intention, we follow the same course here.

463 U.S. at 836–37, 103 S.Ct. at 3359–60.

Thus, we are not writing on a clean slate and it is against this uncertain background that we must determine whether the plaintiffs in the instant appeal have established a right to judgment under § 1985(3). It is undisputed that the defendants were motivated by political considerations and that race was in no way a factor. We are, therefore, presented with a type of "wholly nonracial, but politically motivated" conspiracy that the Court discussed in *Scott.*

 There is some support in other circuits for the proposition that the victims of a nonracial political conspiracy may recover under § 1985(3). *See Keating v. Carey*, 706 F.2d 377 (2d Cir.1983); *Means v. Wilson*, 522 F.2d 833 (8th Cir.1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976); *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Cameron v. Block*, 473

F.2d 608 (6th Cir.1973).[11] However, *Keating, Means, Glasson,* and *Cameron* were decided prior to *Scott.* We agree with the Fourth Circuit's observation in *Harrison v. KVAT Food Management, Inc.*, 766 F.2d 155 (4th Cir.1985), that *Scott* calls for a reconsideration of the status of purely political conspiracies under § 1985(3), as the latter decision is a powerful indication that, when squarely confronted with the question, the Court would not include such conspiracies within the scope of the provision. It is the obligation of the subordinate jurisdictions to divine the direction of the Court, and the considered dictum in *Scott* cannot be ignored. The question of the classes protected under the provision is one of statutory construction. As construed in *Griffin* and *Scott*, § 1985(3) was enacted to fulfill a highly specific purpose and to meet an unusual condition in the Reconstruction era. Since its decision in *Griffin*, the Court has not expressly provided a remedy to a group or class other than blacks. The import of both *Griffin* and *Scott* is that the legislative history of § 1985(3) does not support extending the statute to include conspiracies other than those motivated by a racial, class-based animus against "Negroes and their supporters." Thus, we join the conclusion of the Fourth Circuit in *Harrison* that § 1985(3) does not reach nonracial political conspiracies.[12]

 In comparison with *Harrison*, this case presents a far greater danger that, in the words of *Scott*, § 1985(3) would provide "a remedy for every concerted effort by one political group to nullify the influence of or do injury to a competing group by use of otherwise unlawful means" and would

---

**11.** This court's decision in *Smith v. Cherry*, 489 F.2d 1098 (7th Cir.1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974), presents a factually analogous situation to the present case, as it dealt with a sham candidate, and would be strong support for the plaintiffs. However, *Cherry* was decided under 42 U.S.C. § 1983, *see* 489 F.2d at 1100, 1102, and is therefore inapplicable.

**12.** We also note that, while the opinion is not free of ambiguity, it would appear that the Tenth Circuit, in *Brown v. Reardon*, 770 F.2d 896 (10th Cir.1985), concluded that, after *Scott,*

wholly political conspiracies are outside the scope of § 1985(3). *See also Wilhelm v. Continental Title Co.*, 720 F.2d 1173, 1175 (10th Cir. 1983) (stating in dictum that, after *Scott,* § 1985(3) does not cover conspiracies motivated by a wholly political animus), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984).

Our holding today does not, of course, disturb our prior decisions in which we held that conspiracies animated by *both* racial and political motives were within the scope of § 1985(3). *See, e.g., Quinones v. Szorc*, 771 F.2d 289, 291–92 (7th Cir.1985).

make "the federal courts ... the monitors of campaign tactics in ... state elections." [13] As the Court noted, this is a role that the federal judiciary should not be quick to assume. The district court observed in this case that "the issue of causation is bound to bring the merits of the election race" into the litigation and thus "the local election was being refought in the courthouse." 585 F.Supp. at 1091. John Grimes was perhaps a prototypical "sham" candidate, so inquiry into his intent in running yielded unambiguous results. If, however, Grimes had done any campaigning, the court would be placed in the untoward position of determining whether he was a truly "serious" candidate.[14] In addition, liability for sham candidates may in fact deter those serious candidates who would wish to run, but have little or no support. Furthermore, an election campaign is a method of disseminating ideas as well as attaining political office. *See Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 186, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979). However, candidates with little support who simply wish to use the campaign as a forum for the exchange of ideas could be unnecessarily deterred from engaging in this form of political expression, because of the potential costs of defending a § 1985(3) suit.

This is not to say that Congress could not or should not proscribe the type of fraud presented in this case. We find, however, that it has not done so with § 1985(3) and, in addition, that the open-ended structure of the statute is ill-equipped to handle the competing concerns present in litigation involving this garden-variety type of vote fraud. The trial court's grant of judgment for the defendants will be affirmed.[15]

### III

For the reasons stated above, the judgment of the district court is AFFIRMED.[16]

---

**13.** As the district court noted, the effects of this fraud could have been avoided if the voters had read the ballot "with a modicum of care." 585 F.Supp. at 1090. Appellees thus argue that there can be no interference with the plaintiffs' right to vote, because the Constitution "does not protect the right to vote blindly." We reject this argument as patently absurd under these facts. The jury found that the defendants conspired to place John Grimes on the ballot in order to confuse the supporters of Douglas Grimes. What the defendants are essentially arguing is that there can be no recovery for the plaintiffs, because only "negligent" voters were taken in by the scheme. Our response to this disingenuous position parallels that of the district court. *See* 585 F.Supp. at 1090. First, the defendants are asserting in substance a defense of contributory negligence, which is not available in a fraud action. Second, because voter qualifications are now minimal, it must be recognized that many voters are unsophisticated, uneducated, or uninformed. The defendants' arguments on appeal are an implicit concession that it was in fact this group that the conspirators chose as their victims. The burden on these voters to acquire enough information to vote intelligently may be substantial, and the relaxation of voter qualifications would be of little value indeed if the unsophisticated, uneducated, and uninformed who were now entitled to vote were not also entitled to choose from a ballot free of intentional fraud. As the district court stated, "Their right to vote might be seriously impaired if they had no legal protection against attempts to mislead them, even though more alert and informed voters would not be misled." 585 F.Supp. at 1090.

**14.** *Cf. Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 183–87, 99 S.Ct. 983, 989–91, 59 L.Ed.2d 230 (1979); *Rudisill v. Flynn,* 619 F.2d 692, 695 (7th Cir.1980).

**15.** Because the plaintiffs are not entitled to recover under § 1985(3), we need not consider their request that Judge Graddick be removed from office.

**16.** Due to the disposition of this appeal, we express no opinion on the district court's conclusion that the "state involvement" requirement set forth in *Scott,* 463 U.S. at 831–34, 103 S.Ct. at 3357–58 (citing with approval *Murphy v. Mount Carmel High School,* 543 F.2d 1189 (7th Cir.1976)), was met in this case. We do note, however, that, because race is not a factor in the conspiracy, the plaintiffs' claims of vote dilution and debasement can be based on the Fourteenth Amendment only. *See Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). Thus, the dismissal of the plaintiffs' § 1983 claim, *see supra* note 4, could arguably lead to the conclusion that there was inadequate state involvement for § 1985(3). *See Lugar v. Ed-*

mondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); Greco v. Guss, 775 F.2d 161, 165–167 (7th Cir.1985). In addition, the conspiracy here was made up of private individuals only. The jury's verdict indicates no complicity or acquiescence by government officials. Indeed, at oral argument, counsel for the plaintiffs stated categorically that no complaint about the election was made to federal or state authorities prior to the filing of this lawsuit. The fraudulent activities of these private parties, while admittedly tainting the election, cannot "be ascribed to any governmental decision" and did not "have the authority of state officials to put the weight of the State behind their private decision." Lugar, 457 U.S. at 940, 102 S.Ct. at 2755.

It is true that the state was "affected by" the conspiracy in the sense that an individual may be serving as City Judge who was not the choice of the majority of the voters. However, we do not believe that, in using the term "affected by"

in Scott (see 463 U.S. at 833, 103 S.Ct. at 3358), the Supreme Court intended that the term have the same meaning it would have in, for example, the Commerce-Clause cases, see e.g., Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), because this would represent a radical departure from prior cases construing the Fourteenth Amendment. See e.g., Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); Lugar, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482; Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). From the state's point of view, the conspiracy at issue is no different from the bribing or intimidation of voters by private individuals, the theft of vote cards by private individuals, or the sabotage of voting machines by private individuals. Because the state, under these facts, was no more than an unwitting pawn or victim in the scheme, it would appear that the state involvement required under the Fourteenth Amendment may well be lacking.