**THILLENS, INC., Plaintiff,**

v.

**Michael E. FRYZEL, etc., Defendant.**

**No. 88 C 7714.**

United States District Court,
N.D. Illinois, E.D.

April 7, 1989.

Robert J. Downing, Marc H. Heisler, and Miller, Forest & Downing, Ltd., Glenview, Ill., for plaintiff.

William K. Kane, Asst. Atty. Gen., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Thillens, Inc. ("Thillens") has brought a four-count Amended Complaint (the "Complaint")[1] against Michael E. Fryzel ("Fryzel") in his individual capacity as the Director of the Department of Financial Institutions of the State of Illinois ("DFI"). Because Thillens invokes several patently inapplicable bases for his lawsuit,[2] the only ones that merit any discussion at all are those alleging:

1. unlawful deprivation of Thillens' civil rights in violation of 42 U.S.C. § 1983 ("Section 1983") (Count I);

2. conspiracy and "neglect or refusal to prevent" the wrong conspired to be done in violation of Section 1983 (Count II); and

3. unlawful conspiracy and combination in restraint of trade in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2 (Counts III and IV).

Fryzel has moved under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss the entire Complaint for failure to state a claim. For the

---

1. Thillens' initial effort in this action had been the filing of a complaint naming Fryzel *not* individually but in his *official* capacity, and including a RICO claim as well as pendent state law claims. Such an official-capacity lawsuit posed obvious Eleventh Amendment problems (see, e.g., *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978)), and it failed—precisely because it was framed in official-capacity terms—to come within the area carved out by *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) as a permissible basis for suit against unlawful conduct by state officers. This Court therefore dismissed that original pleading. Thillens then repleaded in the way described in the text, though the Complaint leaves much to be desired in its failure to focus solely on Fryzel—in his individual capacity—as the lone defendant.

2. In part Complaint ¶ 1 speaks of jurisdiction based directly on:
   1. the Contracts Clause, U.S. Const. art. I, § 10 (because no such state-official counterpart of *Bivens* actions exists, any violation of that constitutional provision must draw upon 42 U.S.C. § 1983 as the basis for suit; see, e.g., *Thomas v. Shipka,* 818 F.2d 496, 499, *reh'g in part on other grounds,* 829 F.2d 570 (6th Cir. 1987)); and
   2. the Fifth Amendment (but that is nonsense, because it does not apply to state actors and there is no reason to incorporate via the Fourteenth Amendment provisions that are already in that Amendment as direct guaranties).

   Thillens also alludes to 42 U.S.C. §§ 1985(2) and 1981, but any reading of those statutes and the case law construing them confirms their obvious and total inapplicablity here.

reasons stated in this memorandum opinion and order, Fryzel's motion is granted, and not only the Complaint but this action itself is dismissed.

## Background [3]

In brief summary, Thillens' lengthy and rambling Complaint charges that certain provisions of the Community Currency Exchange Act (the "Act"), Ill.Rev.Stat. ch. 17, ¶¶ 4802–4852,[4] are both unconstitutional and anticompetitive as applied to Thillens. This opinion will substantially abridge the story that unfolds in the Complaint, for no more is necessary to decide the present motion.

At the time of its original passage on July 1, 1943[5] the Act's application was limited to "community currency exchanges," defined as organizations engaging in providing facilities for and actually cashing checks and money orders and issuing money orders, all for a fee. It brought such exchanges under the licensing authority of the Auditor of Public Accounts, DFI's predecessor. Two years after the Act's passage *McDougall v. Lueder*, 389 Ill. 141, 58 N.E.2d 899 (1945) held it a constitutional exercise of the police power (both in federal and state constitutional terms).

Beginning in 1934 Melvin Thillens ran a business (later incorporated in 1949 as Thillens, Inc.) that served as a "mobile check cashing service"—an armored truck that traveled to other businesses on paydays, cashing employees' paychecks for a fee. *People ex rel. Barrett v. Thillens*, 400 Ill. 224, 79 N.E.2d 609 (1948) decided that business was not within the Act's purview. Then in 1951 the Act was amended to embrace what was defined as an "ambulatory currency exchange," thus bringing Thillens under the statute.[6] Section .01 of the 1951 amendment (which became Paragraph 4801 when the Act was later codified in Ill.Rev. Stat. ch. 17) was a preamble stating the findings and declaration of the General Assembly. In material part that preamble found:

1. Community currency exchanges were "affected with a public interest and should be licensed and regulated as a business affecting the convenience, general welfare, and economic interest of the people of this State."

2. Ambulatory currency exchanges, which competed with other currency exchanges and were "hazardous and dangerous to the public safety," should be similarly regulated.

Accordingly the amendment required Thillens to obtain and pay for a license for each location it served.

Six years later *Thillens, Inc. v. Morey*, 11 Ill.2d 579, 144 N.E.2d 735 (1957) held the amended Act, as applied to Thillens, violated neither the due process clause nor the equal protection clause of the Illinois Constitution.[7] Then in 1959 the Act was further amended to increase licensing fees (and to make other minor changes). Paragraph 4801 was amended to include a policy to limit the number of ambulatory currency exchanges according to community needs. Thillens then claimed the DFI dis-

---

**3.** Familiar Rule 12(b)(6) principles require this Court to accept as true all of Thillens' well-pleaded factual allegations in the Complaint, drawing all reasonable inferences in Thillens' favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). Paragraphs in the Complaint will be cited simply "¶—."

**4.** Further citations to the Act will take the form "Paragraph—," referring to the Chapter 17 numbering rather than to the Act's internal numbering of its sections.

**5.** That original enactment was codified in Ill. Rev.Stat. ch. 16½, §§ 30–56.3. After 1979 the legislation was renumbered and transferred to Chapter 17 as part of a legislative revision program mandated by the General Assembly.

**6.** Thillens alleges (¶¶ 13, 15) that then-Governor Adlai Stevenson vetoed a 1949 bill to that effect, and that he neither approved nor vetoed the nearly-identical 1951 bill that eventually became law. Like so much of the Complaint, those facts do nothing to advance its legal viability.

**7.** Though those clauses directly track the language of the Fourteenth Amendment and though the Illinois Supreme Court drew on Fourteenth Amendment jurisprudence in reaching its conclusions, the opinion did not in terms decide the issues under the United States Constitution.

criminated against it in granting licenses, and that attack was rejected in *Thillens, Inc. v. Department of Financial Institutions,* 24 Ill.2d 110, 180 N.E.2d 494 (1962).

In June 1965 an article in *Chicago's American* revealed a bribery and corruption scheme involving members of the Community Currency Exchange Association (the "Association") and various state legislators, in which bribes were given in exchange for preferential treatment to Association members and maltreatment for Thillens. That article led to an investigation that ultimately culminated in 1979–80 with the indictment, trials and convictions of several legislators and Association members. According to the Complaint the origins of the conspiracy trace back to January 1958.

In 1977 (apparently in the midst of the ongoing investigations) the General Assembly passed Illinois P.A. 80–442, its sole provision being the repeal of Paragraph 4801. In a Senate floor debate on passage of the repeal provision, Senator David Shapiro said the provision should be repealed because its findings were fictitious and unsubstantiated. But it is important to note —as neither litigant has—that the General Assembly simultaneously (by P.A. 80–438, effective the same date as P.A. 80–442) adopted a new set of findings (now Paragraph 4838) that, while eliminating the earlier pejorative characterization of ambulatory currency exchanges, specifically found that both such exchanges and the community currency exchanges required comparable regulation by the DFI "in the public interest, convenience, welfare and good."

Thillens adverts to its efforts from 1965 to 1986 to "cure the defects and inequities" in the Act by supporting 41 pieces of legislation, almost all unsuccessfully (¶ 21). As a result Thillens has had 425 license applications rejected from 1960 to 1987 and has seen the number of businesses it serves decline from 1400 in 1958 to 500–550 currently.

### Thillens' Claims

Thillens grounds its claims in large part (though not entirely) in the alleged conspiracy between the Association and its member exchanges and individuals on the one hand and certain public officials on the other. Those public officials consisted primarily of state legislators who accepted bribes in exchange for passing "anti-Thillens" legislation and DFI administrators (not Fryzel) who promulgated guidelines and regulations, and rendered licensing decisions, adverse to Thillens and in favor of Association member exchanges.

Although the Complaint is far from clear, it asserts the Act and actions of DFI under the Act's authority:

   1. deprive Thillens of the equal protection of the laws as guaranteed by the Fourteenth Amendment;

   2. deprive Thillens of due process as guaranteed by the Fourteenth Amendment;

   3. violate Thillens' rights under the "Contracts Clause," U.S. Const. art. I, § 10; and

   4. are anticompetitive and in restraint of trade as prohibited by the Sherman Act.

Thillens asks for prospective relief to prevent further enforcement of the Act against it.[8]

Analysis of Thillens' claims is hindered by the absence of any allegation implicating sole defendant Fryzel in the bribery scheme or, indeed, any conspiratorial activity. Instead the entire Complaint remains infected with Thillens' original conception that suit was proper against Fryzel in his *official* capacity, so that he stood as surrogate for his predecessors in office, for the corrupt legislators and for the State itself

---

8. Fryzel's first memorandum asserted a qualified immunity defense, apparently reading the Complaint as requesting damages as well as injunctive relief (that view may have been occasioned by the boilerplate inclusion, in each prayer for relief, of the invariable request for "such other and further relief as law and equity allow"). Thillens' responsive memorandum acknowledged that *only* prospective relief was sought. Because qualified immunity applies only to cases involving money damages (see, e.g., *Rodriguez v. Board of Education,* 620 F.2d 362, 366 (2d Cir.1980)), Fryzel's reply memorandum has abandoned that line of defense.

in all respects. In fact, the allegations added to the Complaint's multi-count-applicable allegations by Counts III and IV say nothing whatever about Fryzel—they speak only of alleged actions by the State and DFI. Even though this opinion gives Thillens the benefit of the inferences referred to in n. 3, it thus takes a real stretch to consider a good deal of what has been alleged in the Complaint as "well-pleaded" in the legal sense.

### Due Process

■ As for Thillens' due process claim, its own Complaint referred this Court to the Illinois Supreme Court's decision in *Thillens, Inc. v. Morey*, 11 Ill.2d 579, 144 N.E.2d 735 (1957), in which the Act was declared *not* violative of due process (albeit, as already indicated, under the comparable provision of the Illinois Constitution rather than the Fourteenth Amendment). Morey was then the Auditor of Public Accounts, the direct predecessor of Fryzel's position as DFI director—hence the parties are identical for legal purposes.

Thus the question of the preclusive effect of the *Morey* case is directly raised by the Complaint itself. *PaineWebber, Inc. v. Farnam*, 870 F.2d 1286, 1289–91 (7th Cir. 1989) has just revisited the preclusive effect of an Illinois state court judgment in federal court. Under 28 U.S.C. § 1738 this Court must give the same preclusive effect to the state court judgment as would be given by an Illinois state court. Under the Illinois "law of the case" doctrine (*id.* at 1290–91) a ruling on a question of law "is generally binding on courts of equal or inferior dignity as to that legal issue between the same or substantially similar parties given the same material facts" (*id.*) (citations omitted). Though most frequently applied on remand from appellate rulings on questions of law, the doctrine has also been invoked in federal courts to apply to orders issuing from state courts (*id.* at 1291).

As with the corresponding issue-preclusion principle that normally applies to earlier *factual* determinations, in order for the law of the case doctrine to apply the relevant question of *law* must have been "actually decided" in the former proceeding (*id.* at 1290). In this case that inquiry translates into two questions:

1. Was the federal issue actually decided?

2. Was the same Act at issue?

As for the first question, it has already been explained that Thillens' contention in *Morey* was that the Act violated the Illinois Constitution's due process clause (11 Ill.2d at 587, 144 N.E.2d at 740). But the standard employed by the Illinois Supreme Court (*id.* at 591, 144 N.E.2d at 741–42) cannot be distinguished from that under the federal Due Process Clause:

[A]ll presumptions are in favor of the constitutionality of legislation once it becomes the law of the State, and all reasonable doubts must be resolved in its favor. The party attacking the validity of a statute has the burden of proving that it is clearly arbitrary and has no foundation in the police power for its existence. Where the reasonableness of the legislation is fairly debatable the courts will not interfere with the legislative judgment and will not substitute their judgment for that of the legislative department.

That reads like a paraphrase of the constitutional test articulated two years earlier in *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955) (citations omitted):

But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new [law].... It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it. The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.... We emphasize again what Chief Justice Waite said in *Munn v. State of Illinois*, 94 U.S.

113, 134, 24 L.Ed. 77, "For protection against abuses by legislatures the people must resort to the polls, not to the courts."

Whether or not Thillens framed its earlier lawsuit in *federal* constitutional terms, then, both its arguments and those opposing it drew from the same source as Due Process Clause jurisprudence. Law of the case principles, with their requirement that the legal question have been "actually decided" in the earlier lawsuit, would be sapped of their force if Thillens were permitted to split its attack in the way it now seeks to do. On the issue of the Act's constitutionality in due process terms, it had its day in court, with full plenary review, over three decades ago. It cannot now replow the same field, for as *Paine Webber*, 870 F.2d at 1290 put it:

> An issue may be "actually decided" even without an express ruling if a court can determine that the issue in question was decided by necessary implication. Restatement (Second) of Judgments § 27 comment g (1982). *See also Morrow v. Dillard*, 580 F.2d 1284, 1290 (5th Cir. 1978).

As for the second question, the only material legislative change to which Thillens points is the repeal of Section .01 (Paragraph 4801).[9] Two independent answers defeat any attempt to rely on that change as somehow distinguishing the Act at issue in *Morey* from the present Act now under attack here.

For one thing, well settled Illinois law (*Brown v. Kirk*, 64 Ill.2d 144, 152, 355 N.E.2d 12, 16 (1976), quoted in *Hayen v. County of Ogle*, 116 Ill.App.3d 80, 84, 71 Ill.Dec. 644, 647, 451 N.E.2d 612, 615 (2d Dist.1983)) states:

> But a declaration of policy, like a preamble, "is no part of the Act."

*Brown, id.*, goes on to quote Sutherland, *Statutes and Statutory Construction* §§ 20.03, 20.12, 47.04 (4th ed. 1972):

> The policy section like the preamble is available for the clarification of ambiguous provisions of the statute, but may

not be used for the creation of ambiguity.

As a matter of statutory construction, then, the repeal of Paragraph 4801 is of no moment. For substantive purposes the Act remains identical to its form and content when *Morey* was decided.

Thillens attempts to escape the consequences of that identity by referring to statements made during the Illinois Senate floor debate repealing Paragraph 4801 (¶ 20(b)). But Illinois law is also clear that opinions of individual legislators are not taken into account in construing a statute or determining its effect (*Lubezny v. Ball*, 322 Ill.App. 78, 86–87, 53 N.E.2d 988, 993 (2d Dist.1943); and see *In re Sinclair*, 870 F.2d 1340, 1343–44 (7th Cir.1989)). That argument gets Thillens nowhere as well.

There is a second and independently sufficient predicate for rejecting Thillens' current effort to wriggle out of the effect of the adverse *Morey* decision. As already explained, the combined effect of P.A. 80–438 and 80–442 was to substitute a new set of legislative findings for the arguably tainted ones embodied in Paragraph 4801. What the General Assembly did in Paragraph 4838—at a time when the scandals identified in the Complaint had been exposed to public view—was to take a fresh look at the substantive provisions of the Act and to support them anew by a statement of purposes that was subject to none of the claimed flaws that Thillens attaches to the original enactment. If the preamble *were* to be taken into account, then, the Act would stand on even more solid footing than *Morey* would provide. Thillens cannot complain of *that* change as a basis for relitigating what it fought and lost in *Morey*.

In sum, there is nothing to justify reexamining the result reached in *Morey*, let alone reaching a different result. In that respect, it is parenthetically worth noting how the Complaint misreads the *Morey* opinion. Thillens alleges (¶ 17(a)) *Morey* "expressly relied on the findings contained

9. Thillens also refers to other amendments that increased statutory licensing fees, but it does

not suggest those provide a basis for any claim of constitutional or antitrust violation.

in Section .01" in reaching its decision. Although that provision was cited early in the opinion (11 Ill.2d at 582, 144 N.E.2d at 737), that was simply part of a 2–½ page review of all of the Act's relevant provisions. Thereafter the Illinois Supreme Court never referred to the provision again, instead relying on extensive findings of fact made by the trial court as to conditions in the currency exchange and ambulatory currency exchange business (*id.* at 588–92, 144 N.E.2d at 740–42). Those findings of fact blend with the Supreme Court's legal analysis for law of the case purposes.

Indeed, it is clear that the legislature's *actual* purpose (even assuming legislative intent is in some way truly ascertainable, see *Sinclair*) is wholly irrelevant in the normal due process analysis. Under the conventional "rational basis" test, economic legislation will be upheld if the legislature *could* have concluded that the law is reasonably related to *any* legitimate state objective (*United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980)).

Finally, any argument by Thillens that the statute violates due process because it was passed in furtherance of an alleged conspiracy is clearly misplaced in light of *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968):

> It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.

Once again, as with each of its other contentions under the Due Process Clause, Thillens fails abysmally.

### Equal Protection Clause

■ Thillens also claims the Act violates the Equal Protection Clause. But because Thillens can make no claim to be (or to be part of) a "suspect class," that contention is subject to the same standard "rational basis" test that applies to due process claims. Hence the same analysis that spelled Thillens' defeat in the preceding section of this opinion applies with equal force here.

*Morey,* 11 Ill.2d at 594–95, 144 N.E.2d at 743–44 applied just such an analysis, as set forth in *Lee Optical* and *Lindsley v. National Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–341, 55 L.Ed. 369 (1911), to Thillens' then-advanced equal protection claim. Indeed, it was only then that *Morey* adverted to Illinois decisions, stating "The foregoing principles are of equal application in the State of Illinois."

Using that analysis drawn directly from the United States Constitution, *Morey* found it was reasonable for the General Assembly to protect the public by regulating currency exchanges, both ambulatory and otherwise. Section 4838 still reflects that goal. For the reasons already stated, that post-scandal legislative determination is—if anything—even more reasonable than it was in 1951 when the amendments were passed. *Morey's* equal protection decision must be viewed as equally applicable today in law-of-the-case terms, if not indeed reinforced by Section 4838.

### Conspiracy

There is a general aura of conspiracy about the Complaint, discussed to some extent in the parties' briefs. Nothing about that discussion has converted that aura into anything even as detectable as ectoplasm, let alone anything more solid.

First, Count II is styled "Conspiracy and Neglect or Refusal to Prevent Wrong Conspired to be Done [under] 42 U.S.C. § 1983." But Thillens fails to allege any involvement of Fryzel in any conspiracy, outside of his enforcing an assertedly unconstitutional Act. That claim certainly falls with a decision that the Act is constitutional.

■ Second, although both parties expended energy in discussing conspiracy claims under 42 U.S.C. §§ 1985(3) ("Section 1985(3)") and 1986 ("Section 1986"), no such claim is advanced in the Complaint. Instead the Count II prayer for relief (in its ¶ B(4)) asserts a Section 1983 claim *based* on a claimed violation of Section 1985. But *Howard v. State Department of Highways*

*of Colorado,* 478 F.2d 581, 585 (10th Cir. 1973) teaches that Section 1985(3)—like Section 1983—does not itself create any separate rights. In turn that means such a claim is not enforceable *via* Section 1983 (which is also available only to enforce *other* rights secured by the Constitution and laws of the United States).

■ Third, even apart from that problem, a Section 1985(3) claim must allege something more than a nonracial political conspiracy (*Grimes v. Smith,* 776 F.2d 1359, 1364–67 (7th Cir.1985)). At best Thillens has alleged a nonracial political conspiracy, which must therefore fail. For the same reason any Section 1986 claim (if one could be found in the Complaint) could not survive either (*id.* at 1363 n. 4, holding Section 1986 liability purely derivative of that under Section 1985(3)).

### Licensing Denials

Yet another example of what appears to be a failure to think through Thillens' claims before filing suit is the Complaint's apparent lumping together of claimed injury caused by passage of the Act (by legislators) and enforcement of the Act (by DFI) in issuing licenses. Nonetheless, because Thillens repeatedly alleges that it was unjustifiably denied 425 licenses, the question of separate constitutional violations in the licensing process should be dealt with.

In that respect, such wholly conclusory allegations as Thillens advances will not suffice. True enough, Thillens does allege that DFI officials (not Fryzel, it should again be emphasized) were bribed to promulgate rules, regulations and guidelines (¶ 24(j))—but there is no suggestion that the resulting product was unfaithful to the Act, which has withstood Thillens' constitutional attack not once but twice. Under those circumstances no constitutional infirmity attaches to the implementing rules and regulations either. In like manner, ¶ 24(j)(1) alleges that DFI has used geographic criteria and indicia of financial stability in making licensing decisions. Absent any indication (and there is none) that those were improper and unconstitutional criteria to consider, such decisions are likewise unassailable.

In short, nothing alleged by Thillens separates licensing denials from the Act itself in constitutional terms. Accordingly any charges as to such denials fare no better than those already considered.

### Contracts Clause Claims

Although the Complaint does refer to the Contracts Clause, which prevents states from passing any law impairing the obligations of contracts, neither litigant has addressed the issue in briefing the current motion. That omission is entirely understandable, given the fact that the last legislation that could possibly be at issue was passed some 30 years ago. Clearly any claim under the Contracts Clause must be barred by limitations.

### Antitrust

■ Finally Thillens claims violations of the Sherman Act both directly (Counts III and IV) and as bases for Section 1983 claims (Counts I and II). However framed, those claims rest on the untenable proposition that the State of Illinois' passage and enforcement of the Act against Thillens violates the Sherman Act.[10]

Nearly a half century ago *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) announced the now-familiar proposition that the acts of a state legislature in passing legislation are exempt from the operation of the antitrust laws. *Hoover v. Ronwin,* 466 U.S. 558, 567–69, 104 S.Ct. 1989, 1994–96, 80 L.Ed.2d 590 (1984) has not only reaffirmed *Parker* but announced that the conduct of anyone directly representing a state, so long as that conduct carries out a clearly articulated

---

**10.** Indeed, Counts III and IV refer *only* to the State of Illinois and DFI as alleged antitrust law violators—they are entirely silent as to how Fryzel (the only defendant) has purportedly breached those statutes. That lapse is symptomatic of how, even after this Court had pointed out the Eleventh Amendment difficulties posed by the original complaint (see n. 1), Thillens' counsel did not think through the question of just how Fryzel could even arguably be held liable in purely individual terms.

and affirmatively expressed state policy, is similarly exempt.

Fryzel's continued enforcement of the Act is unassailable. Though his acts have been taken in his "administrative capacity, [they] were direct implementations of a precise statutory policy" (*Llewellyn v. Crothers,* 765 F.2d 769, 773 (9th Cir.1985)) and are therefore immune. "[E]ven the constitutional invalidity of the attempted state regulation is not an appropriate basis for disregarding the immunity conferred by *Parker,*" given the principles of federalism that underlie such immunity (*id.* at 774). And even accepting the Complaint's allegations of corruption on the part of some legislators in cahoots with the Association, that does not tar Fryzel (the sole plaintiff), let alone the State of Illinois as such, with antitrust liability.

### Conclusion

Thillens' own Complaint explains in great detail how it has tried in vain to gain the relief it seeks through the Illinois legislature. After more than 30 years it has given up those efforts in favor of seeking a remedy in federal court. That extended delay really confirms—though quite unintentionally—the idea that whether a legislature has acted properly in enacting basic economic legislation is a decision that, in the final analysis, is left to the voters (see, e.g., *Campbell v. City of Chicago,* 639 F.Supp. 1501, 1511 (N.D.Ill.1986) and the earlier-quoted language from *Lee Optical* ).

For the reasons stated in this memorandum opinion and order, the Complaint .is dismissed in its entirety. Indeed, given the nature of Thillens' submissions, this Court sees no way in which any repleading can

salvage this action.[11] Accordingly the action itself is dismissed with prejudice.[12]

---

11. This opinion has not touched at all on another factor that would appear to pose an insurmountable hurdle for Thillens—the time problem. All Thillens says to meet the obvious limitations problems it must face is that it could not have known of the official corruption until 1979 (¶ 26). Even if that is accepted as true, limitations have long since barred any claim rooted in those matters. And of course it is mine-run jurisprudence that the continuation of injury suffered from the same source does not give rise to a new cause of action. This whole problem—even if Thillens wants only prospective relief, why did it not sue while its claim was still fresh in limitations terms?—fortifies the dismissal result reached here.

12. It may be that despite the bulk of both the originally-filed complaint (90 paragraphs occupying 76 pages, exclusive of lengthy exhibits) and the Complaint (62 paragraphs filling 63 pages), Thillens and its counsel have withheld some undisclosed string that could fit (and repair!) their broken bow. If such is the case, Rule 59(e) is available to them.