**Carol HERHOLD and Lawrence Herhold, Plaintiffs,**

v.

**CITY OF CHICAGO, Chicago Firefighters Local 2, and the Retirement Board of the Fireman's Annuity and Benefit Fund of Chicago, Defendants.**

**No. 87 C 2619.**

United States District Court, N.D. Illinois, E.D.

Sept. 28, 1989.

Terrance A. Hilliard and John L. Gubbins, John L. Gubbins & Assoc., Ltd., Chicago, Ill., for plaintiffs.

Floyd Babbitt, Steven J. Teplinsky, James R. Latta and James A. Roth, Fagel, Haber & Maragos, Chicago, Ill., for Retirement Bd. of the Firemen's Annuity and Ben. Fund of Chicago.

Stephen B. Horwitz and Robert S. Sugarman, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., for Chicago Firefighters Local 2.

Judson H. Miner, Corp. Counsel, and Patricia Carroll, Asst. Corp. Counsel, Chicago, Ill., for City of Chicago.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This case is brought pursuant to 42 U.S.C. § 1983 and § 1985(3) challenging employment and benefits actions taken by defendants in alleged retaliation for plaintiffs' exercise of first amendment rights. Pending are motions for summary judgment brought by the defendants, the City of Chicago ("City"), the Chicago Fire Fighters Union Local No. 2 ("Union") and the Retirement Board of the Firemen's Annuity and Benefit Fund of Chicago ("Board"). For the reasons described below, defendants' motions are granted.

### II. FACTS [1]

■ Plaintiff Carol Herhold ("Carol") was hired by the Chicago Fire Department ("CFD") as a paramedic in September, 1976. (City 12(e) ¶ 1; Plaintiffs 12(e) ¶ 1.)

---

1. All defendants have accompanied their summary judgment motions with statements of material facts as to which they contend there is no dispute, as required by local General Rule 12(e) (now superceded by General Rule 12(*l*)). General Rule 12(f) (superceded by General Rule 12(m)) requires the opponent of a summary judgment motion to respond to the 12(e) statement by submitting a statement of material facts which are in dispute. These statements are critical to allow the Court to focus on the relevant factual and legal issues without having to pore through exhibits and argumentative factual narratives in an attempt to discern which facts are agreed upon. Despite admonitions to plaintiffs' counsel in prior cases as to the importance of these statements, *see Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989); *Conroy v. City of Chicago*, 708 F.Supp. 927, 929 n. 3 (N.D.Ill.1989), plaintiffs' counsel has again violated Rule 12 by submitting, rather than a 12(f) statement, a 12(e) "Statement of Material Facts To Which There Is No Genuine Issues Of Fact." Plaintiffs thus apparently concede that the facts are not in dispute and that only issues of law remain. Plaintiffs' 12(e) statement does not respond point by point to undisputed facts described in defendants' 12(e) statements. It is merely an alternative narrative of the facts, and it thus does not fulfill the purpose of Rule 12. Because plaintiffs have not filed a 12(f) statement, the Court has accepted as true those assertions of fact in defendants' 12(e) statements which are not addressed by plaintiffs. *See Herman*, 870 F.2d at 404; *Ford Motor Credit Co. v. Solway*, 825 F.2d 1213, 1214 n. 1 (7th Cir.1987); *Harbin v. Sun Life Assurance Co.*, 710 F.Supp. 1167, 1168 (N.D.Ill.1989); *De Bono v. Chicago Sun-Times, Inc.*, 707 F.Supp. 363, 363 (N.D.Ill. 1989).

In providing authority for factual statements in this opinion, the Court has generally cited only to the Rule 12 statements. However, the Court has reviewed numerous exhibits referenced in the Rule 12 statements, and the cites to the Rule 12 statements include the exhibit cites by reference. In a few instances the Court has simply omitted minor factual assertions by defendants which were not supported by the exhibit cites. The Court has also omitted numerous background facts described by plaintiffs, such as the merits of their state court lawsuits, which may be interesting but are not material to the issues raised in defendants' motions.

Her husband, plaintiff Lawrence Herhold ("Lawrence"), was hired by the CFD as a paramedic in 1978. (City 12(e) ¶ 1; Plaintiffs 12(e) ¶ 1.) Until September 1988, Carol was assigned to an ambulance. (City 12(e) ¶ 10; Plaintiffs 12(e) ¶ 2.) From September, 1980, through May, 1982, Carol served as an inspector of paramedics in the CFD's Inspections and Auditing Division ("IAD"). (City 12(e) ¶ 7.) Her job duties involved investigating complaints against paramedics. (City 12(e) ¶ 7; Plaintiffs 12(e) ¶ 3.) This was an unpopular assignment, and financial inducements were made to attract paramedics to the position. (City 12(e) ¶ 8.) Carol was the first woman to hold this position. (Plaintiffs 12(e) ¶ 3.)

On July 14, 1981, Carol and other female paramedics filed a charge with the EEOC alleging that the CFD discriminated against women in the promotion of paramedics. (City 12(e) ¶ 11; Board 12(e) ¶ 3; Plaintiffs 12(e) ¶ 4.) On November 13, 1981, Carol filed another charge with the EEOC, accusing the Union of complicity in sex discrimination in CFD promotions. (Union 12(e) ¶ 12; Board 12(e) ¶ 2.) The EEOC found no reasonable cause to believe that these allegations were true and issued right to sue letters in August, 1982. (City 12(e) ¶ 11; Union 12(e) ¶ 12; Board 12(e) ¶¶ 2–3.) Carol never followed up by filing sex discrimination lawsuits.

On January 29, 1982, Carol and a male paramedic filed a lawsuit against the City in the Circuit Court of Cook County, Illinois, challenging CFD paramedic promotion procedures and alleging that the CFD did not adhere to its own procedural guidelines concerning promotions. (City 12(e) ¶ 13; Board 12(e) ¶ 1; Plaintiffs 12(e) ¶ 12.) The Union intervened as a defendant. (Union 12(e) ¶ 13.) In light of Carol's heavy involvement in soliciting support for the lawsuit from other paramedics, her supervisors became concerned that she could not objectively investigate and evaluate IAD complaints against those paramedics. (City 12(e) ¶¶ 21, 22.) In early February, 1982, Carol was first notified that she would be transferred out of IAD if she continued to pursue the promotion lawsuit. (City 12(e) ¶ 19.) Her supervisors told her that she could not simultaneously work as an IAD investigator and pursue the promotion lawsuit. Plaintiffs allege that Carol was continually told that if she did not drop the lawsuit, she would lose her job. (Plaintiffs 12(e) ¶ 18.) During the pendency of the lawsuit, she was offered a promotion which she declined. (Plaintiffs 12(e) ¶ 20; City 12(e) ¶ 18.) The plaintiffs eventually voluntarily dismissed their lawsuit. (Carol Dep. at 526; see also City 12(e) ¶ 17.)

In May, 1982, Carol was transferred from IAD to an ambulance that she had requested. (City 12(e) ¶ 23.) Plaintiffs allege that this transfer came shortly after Carol was told by Deputy Fire Commissioner Charlie Roberts that she would be transferred if she pressed the lawsuit. (Plaintiffs 12(e) ¶ 19.) The transfer did not result in a decrease in Carol's career service rank, pay or seniority. (City 12(e) ¶ 25.) Her ambulance duties after the transfer were the same as they had been prior to her transfer to IAD. (City 12(e) ¶ 26.)

In October or November, 1982, Carol injured her back while she was on duty, causing her to go on "medical lay-up" for one year. (City 12(e) ¶ 27; Union 12(e) ¶ 1; Board 12(e) ¶¶ 4–5; Plaintiffs 12(e) ¶ 22.) At that time, she was a participant in the Municipal Employees', Officers', and Officials' Annuity and Benefit Fund ("Municipal Fund"). (Union 12(e) ¶ 2; Board 12(e) ¶ 6.) During her medical lay-up, she received her full salary pursuant to a collective bargaining agreement between the City and the Union. (City 12(e) ¶ 27; Union 12(e) ¶ 3.) [2] At the end of that one-year period, she retired from CFD. In the spring of 1983, while Carol was on medical lay-up, she was informed that she, Lawrence and several other paramedics would be promoted to the position of Paramedic Officer, retroactive to January 1, 1983.

---

**2.** Paramedics are entitled to one year of pay and benefits for leave required by reason of duty-related injuries. After the expiration of one year, paramedics can no longer remain on the CFD payroll but may seek disability benefits from the appropriate pension fund. (Plaintiffs 12(e) ¶ 22; Union Mem. at 1.)

The promotion took place shortly thereafter, and included back pay to January 1, 1983. (City 12(e) ¶ 28; see also Plaintiffs 12(e) ¶ 20.)

At the time of Carol's injury, paramedics were covered by the Municipal Fund. In early 1983, the Union's president, Martin Holland, informed the Union's members that he was working to have paramedics covered by the Firemen's Annuity and Benefit Fund of Chicago (the "Firemen's Fund") instead. (Union 12(e) ¶ 9.) This change had been a major issue in his campaign for president in May, 1982. (Board 12(e) ¶ 7.) The Municipal Fund opposed any change in the law which would require a transfer of money to the Firemen's Fund as a result of such a change in coverage. (Union 12(e) ¶ 10; Board 12(e) ¶ 10.) A compromise was reached whereby paramedics would be included in the Firemen's Fund as of a date certain; the intent was to bring the paramedics into the Firemen's Fund as if they were new employees. (Union 12(e) ¶ 10; Board 12(e) ¶ 14.) On September 24, 1983, the amendment to § 6–106 of the Illinois Pension Code became effective, expanding the definition of "firemen" to include "paramedics" and resulting in the Firemen's Fund covering paramedics employed by the CFD. (Union 12(e) ¶ 4; Board 12(e) ¶ 15.) *See* Ill.Rev.Stat. ch. 108½ § 6–106. The effective date of the amendment was made retroactive to July 1, 1983, and contributions from paramedics were accepted beginning July 1, 1983. (Board 12(e) ¶ 15; Plaintiffs 12(e) ¶ 23.)

On October 26, 1983, Carol applied to the Firemen's Fund for duty disability benefits. (Board 12(e) ¶ 16; Carol Dep. at 342.) She was the first paramedic ever to apply for such benefits from the Firemen's Fund. (City 12(e) ¶ 30; Board 12(e) ¶ 17; Plaintiffs 12(e) ¶ 25.) Before applying for benefits, she had sought advice from a number of sources as to whether she should apply to the Firemen's Fund or the Municipal Fund. (Board 12(e) ¶ 18; Plaintiffs 12(e) ¶ 24.) In November, 1983, Holland expressed his view that Carol was not covered by the Firemen's Fund, and that she should instead apply to the Municipal Fund. (Union 12(e) ¶ 5; Board 12(e) ¶ 19.) Carol disregarded this advice because she spoke to others who told her she could recover benefits from the Firemen's Fund (Plaintiff's 12(e) ¶ 24; Plaintiff's Mem. at 5) and because the benefits from the Firemen's Fund were better (M. Holland Dep. at 31).

During a hearing on December 14, 1983, the Board advised Carol that it believed it did not have jurisdiction over her application. (Union 12(e) ¶ 6; Board 12(e) ¶ 20.) It stated that coverage was determined by the date of her injury, and that she should therefore apply to the Municipal Fund. (Board 12(e) ¶ 21.) However, because Carol had been a member of two funds at the same time and presented a very unusual request, the Board continued the proceeding to give Carol an opportunity to retain an attorney. (Union 12(e) ¶ 6; Board 12(e) ¶ 22.)

The Union does not provide or subsidize legal representation for Union members in connection with claims before the Firemen's Fund. (Union 12(e) ¶ 7.) Carol contacted Union attorney Peter Dowd, who told her to notify the Board that he would represent her, but Dowd subsequently informed her that Martin Holland had told him not to represent her because of a conflict of interest. (Plaintiffs 12(e) ¶ 25; Carol Dep. at 410.)

Carol retained attorney Terrance Hilliard to represent her before the Board. (Union 12(e) ¶ 8; Board 12(e) ¶ 24.) At the next hearing, on January 18, 1984, the Board accepted by a voice vote the view of its attorney, Maynard Russell, that Carol's accident occurred while she was under the Municipal Fund's jurisdiction and that she would not be covered by the Firemen's Fund unless the Municipal Fund transferred to the Firemen's Fund money that it had accumulated. (Union 12(e) ¶ 8; Board 12(e) ¶ 24.) On January 26, 1984, the Board notified Carol in writing of its determination that it lacked jurisdiction over her application. (Union 12(e) ¶ 8; Board 12(e) ¶ 24.)

In February, 1984, Carol filed a lawsuit in the Circuit Court of Cook County, Illinois for administrative review of the Board's

decision. (Union 12(e) ¶ 11; Board 12(e) ¶ 26.) On October 23, 1984, the Circuit Court remanded the case to the Board to permit Carol to present constitutional claims to the Board. (Board 12(e) ¶ 27; Plaintiffs 12(e) ¶ 27.) The Board denied Carol's request for duty disability benefits on the ground that she was not a member of the Firemen's Fund when she was injured. (Board 12(e) ¶ 30.) The Circuit Court reversed this decision on January 17, 1985, and ordered the Board to pay duty disability benefits to Carol. (Union 12(e) ¶ 11; Board 12(e) ¶ 31; Plaintiffs 12(e) ¶ 29.) The Appellate Court affirmed the Circuit Court's ruling on May 6, 1986. (Board 12(e) ¶ 33; Plaintiffs 12(e) ¶ 29.)

Pursuant to a settlement agreement resulting from a separate lawsuit, the Board's determination that an injury is duty-related triggers the accrual of furlough pay while a paramedic is on medical lay-up. (City 12(e) ¶ 31; Plaintiffs 12(e) ¶ 31.) Carol filed a grievance seeking furlough pay on November 2, 1983. On November 21, 1984, the Board determined that Carol's injury was duty-related, and it gave her furlough pay in June, 1985 (City 12(e) ¶ 32; Plaintiffs 12(e) ¶ 31.) The Board members did not know of Carol's lawsuits when they considered her application for furlough pay. (City 12(e) ¶ 33.)

In November, 1984, Lawrence suffered a seizure and was hospitalized. He was subsequently diagnosed as having a brain tumor, and he underwent neurosurgery on December 20, 1984. (City 12(e) ¶ 41; Plaintiffs 12(e) ¶ 32.) As a result, Lawrence is unable to perform the duties required of a paramedic. (City 12(e) ¶ 42; Plaintiffs 12(e) ¶ 32.) The CFD's policy since 1981 has been to offer light duty positions only to employees who have had temporary disabilities and who could eventually return to full and unrestricted duty after recuperation. (City 12(e) ¶ 40.) None of Lawrence's doctors has indicated that Lawrence will ever be able to perform the duties required of a paramedic. (City 12(e) ¶ 44.) The CFD denied a request by Lawrence for a light duty assignment. Lawrence's challenge of that denial is pending before the Illinois Human Rights Commission. (City 12(e) ¶ 53.)

On November 20, 1985, Lawrence applied to the Board for ordinary disability benefits. (Board 12(e) ¶ 58.) He was the first paramedic to apply for ordinary disability benefits after paramedics became covered by the Firemen's Fund. (Board 12(e) ¶ 69.) On December 18, 1985, the Board voted to award him the benefits. (Board 12(e) ¶ 59.) It calculated his benefits based on the amount of time he had been a member of the Firemen's Fund. (Board 12(e) ¶ 62; Plaintiffs 12(e) ¶ 34.) On January 28, 1986, Lawrence filed an action for administrative review of the Board's decision in the Circuit Court of Cook County. (Board 12(e) ¶ 63.) On December 12, 1986, the Circuit Court ordered the Board to calculate his benefits based on his entire time of service as a paramedic. (Board 12(e) ¶ 63; Plaintiffs 12(e) ¶ 35.) This ruling was affirmed by the Appellate Court and by the Illinois Supreme Court. (Board 12(e) ¶¶ 64–66; Plaintiffs 12(e) ¶¶ 35–36. *See Herhold v. Retirement Board*, 156 Ill.App.3d 454, 108 Ill.Dec. 768, 509 N.E.2d 464 (1st Dist.), *aff'd, Herhold v. Retirement Board*, 118 Ill.2d 436, 113 Ill.Dec. 933, 515 N.E.2d 1240 (1987).)

On December 31, 1985, the Board sent Lawrence and all other beneficiaries of ordinary disability payments a letter which stated in part:

> Under provisions of the Internal Revenue Code the ordinary disability benefits granted you from this Fund, beginning November 29, 1985, are considered to be amounts received in lieu of salary and exempt under the same conditions which apply to "sick pay".

(Board 12(e) ¶¶ 71, 73; Plaintiffs 12(e) ¶ 37.) The letter was signed by Norman Holland, the Board's Secretary and Martin Holland's brother. Plaintiffs contend that they discovered a year later that the letter was erroneous. (Plaintiffs 12(e) ¶ 37.)

On September 18, 1986, Norman Holland notified plaintiffs by letter that their appointment for their annual re-examination by the Board's doctor was scheduled for October 15, 1986. (Board 12(e) ¶ 75.) On

October 15, 1986, a letter signed by Holland was hand-delivered to plaintiffs informing them that the appointment was rescheduled for October 29, 1986. (Board 12(e) ¶ 76.)

Plaintiffs filed this lawsuit on March 18, 1987. Count I of their second amended complaint alleges that plaintiffs' rights under the First Amendment were violated when the following actions were taken by "one or more of the defendants" in retaliation against plaintiffs for Carol's pursuit of lawsuits in the Circuit Court and her charges before the EEOC:

(1) the transfer and "effective demotion" of Carol in May, 1982;

(2) the refusal to grant furlough pay to Carol after the expiration of her sick leave;

(3) the initial refusal to promote Carol and Lawrence and the initial refusal to give them back pay;

(4) the refusal by the Union to allow its attorney to represent Carol in her claim against the Firemen's Fund;

(5) the refusal to pay in a timely manner the back benefits due from the Firemen's Fund after the payment was ordered by the Illinois Appellate Court, and the Board's repeated miscalculation and delay of payment of interest due on the back payments;

(6) the City's denial of Lawrence's request for light duty;

(7) the Union's refusal to arbitrate a grievance filed by Lawrence to contest the denial of light duty;

(8) the Board's refusal to pay ordinary disability benefits to Lawrence based on his total time of service with the CFD; and

(9) the Board's declaration that Lawrence's disability compensation for 1986 is taxable income, contrary to IRS regulations and contrary to its statement to Lawrence that the payments were not taxable.

(*See* Second Amended Complaint ¶ 25.) In Count II, plaintiffs allege that defendants' actions described in Count I constitute a conspiracy to deprive plaintiffs of their First Amendment rights in violation of 42 U.S.C. § 1985(3). Plaintiffs seek declaratory relief, injunctive relief prohibiting further retaliation, compensatory and punitive damages, costs and attorneys' fees.

## III. EVIDENCE OF MOTIVES

Plaintiffs describe a number of facts which they apparently allege indicate a bias on the part of defendants against plaintiffs on account of Carol's pursuit of EEOC claims and the promotion lawsuit. Defendants argue that these facts, even if true, are not evidence of retaliation, and that other evidence demonstrates an absence of retaliatory motives. Although many of plaintiffs' claims fail for reasons other than a failure of proof with respect to defendants' motives, and although plaintiffs' position as to the significance of this evidence is generally unclear, it is worthwhile to summarize here the evidence which might be viewed as bearing on defendants' motives.

First, plaintiffs describe an incident which occurred during a court hearing concerning the promotion lawsuit. (Plaintiffs' 12(e) ¶ 14; see also Plaintiffs' Mem. at 2–3.) The Union had intervened in the case and adopted the City's position. John Tebbens and Martin Holland, both of whom were candidates for president of the Union, appeared in court. They were sympathetic to paramedics and would "presumably" have disassociated the Union from the City's position. (Plaintiffs' Mem. at 3). Although Tebbens sought leave to intervene and delay a ruling on the City's summary judgment motion until after the election, Holland refused to request leave to intervene. The court consequently ruled against the paramedics without waiting for the election. Immediately afterward, outside of the courtroom, Carol said to Holland, in front of other paramedics, "You showed us that you don't represent the paramedics." She also made other comments expressing her disappointment, and she later wrote a letter to all of the voting members of the Union expressing displeasure with Holland's conduct. Although plaintiff does not provide a date for this incident, it apparently occurred in early 1982.

Plaintiffs next state that in late 1983, when Carol asked Norman Holland to which fund she should apply for benefits, he referred the question to his brother Martin Holland, who accused Carol of trying to "screw up his pension fund." (Plaintiffs' 12(e) at 24.) He also stated that Carol would have a long court battle in front of her. (Plaintiffs' Mem. at 11).

Plaintiffs further argue that during the Board hearing on November 21, 1984, when the Board determined that Carol's injury was duty-related, only Norman Holland voted that her injury was not duty-related. When Board member Tebbens questioned him concerning his vote, he stated, "Screw the bitch; let her go to Court." (Plaintiffs' 12(e) ¶¶ 27–28.) In the context of the Board's hearings, Holland and Board member Michael Cohen also referred to Carol's father's prison record and his status as a non-striker. (Plaintiffs' 12(e) ¶ 28.) According to Tebbens, Cohen's and Holland's opposition towards Carol's application seemed to be personal. (Plaintiffs' 12(e) ¶ 28.)

Defendants respond that bias on the part of one or two Board members does not support an inference that the entire Board—which consisted of eight voting members—was biased. Furthermore, they point out that plaintiffs' allegations of bias indicate more of a personal bias than a bias based on Carol's exercise of First Amendment rights. Defendants further cite the deposition testimony of Tebbens, who voted in favor of Carol's application in January, 1984, and who Carol does not believe to be a member of any conspiracy. (City 12(e) at ¶ 36.) Tebbens did not believe that the City, the Board and the Union had conspired against plaintiffs, and he believed that other Board members voted their conscience in considering Carol's application. (City 12(e) ¶¶ 37–39.) There is other evidence as well that the Board members acted independently rather than under anyone's direction. (City 12(e) ¶¶ 44–50.) Furthermore, at least five of the Board members (Walter Kozubowski, Michael Cohen, Cecil Partee, Norman Holland and Ann Foley) were not aware of Carol's EEOC claims or promotion lawsuit when they con-sidered her disability claims. (City 12(e) ¶¶ 40–33.) (A sixth Board member, Ronald Maloney, did not participate in the November 21, 1984 proceeding. (City 12(e) ¶ 43.) These Board members were similarly un-aware of Carol's EEOC claims and promotion lawsuit when they voted on Lawrence's application. (City 12(e) ¶ 81.)

Plaintiff also argues that bias on the part of defendants is demonstrated by the Board's treatment of an application for benefits by Mary Hansen, who plaintiffs allege was in a similar position to Carol. Plaintiffs state that Hansen's back injury occurred prior to her membership in the Firemen's Fund, but that the Board never-theless granted her application for bene-fits. As support of this position, plaintiffs submit 1977 and 1980 medical records con-cerning a back condition experienced by Mary Chilcutt. (The Court assumes that Mary Hansen and Mary Chilcutt are the same person.) Defendants respond that after Hansen's injury, she returned to work for the CFD. She then re-injured herself after paramedics had been transfer-red to the Firemen's Fund. (Board 12(e) ¶ 37.) Defendants also argue that Hansen supported Carol's promotion suit (Board 12(e) ¶ 38), which tends to show that any inconsistent treatment which did occur was not due to Carol's pursuit of the lawsuit.

Finally, defendants cite Carol's admission that she knows of no retaliation against other female paramedics who pursued the EEOC claim. (City 12(e) ¶ 12.)

## IV. SECTION 1983

■ To recover against their employer under 42 U.S.C. § 1983 based on depriva-tion of First Amendment rights, plaintiffs must prove (1) that the speech in question pertained to issues of public concern, *see Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), (2) that plain-tiffs' interest in commenting on such public issues outweighed the defendants' legit-imate interests, *see id.*, and (3) that the protected speech was a substantial factor motivating the alleged actions, *see Mt. Healthy City School Dist. Bd. of Edu-cation v. Doyle*, 429 U.S. 274, 287, 97 S.Ct.

568, 576, 50 L.Ed.2d 471 (1977); *see also Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 1789–90, 104 L.Ed.2d 268 (1989). Each defendant argues that plaintiffs have failed to present sufficient evidence with respect to one or more of these requirements.

■■■ Furthermore, if plaintiffs satisfy these requirements, defendants have an opportunity to show that they would have reached the same decision in the absence of plaintiffs' protected speech. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. The burden then reverts to plaintiffs to show that defendants' proffered reasons for their actions are pretextual. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). *See generally Conroy v. City of Chicago,* 708 F.Supp. 927 (N.D.Ill.1989). If plaintiffs are unable to present sufficient evidence to create a genuine issue of material fact with respect to defendants' proffered reasons for their actions, defendants are entitled to summary judgment.

Defendants each raise various other arguments as well. The Court will proceed by addressing each particular action by defendants which plaintiffs allege were taken for retaliatory reasons.

### A. *The Actions*

#### 1. Transfer/Effective Demotion

■■■ The first of the actions challenged by plaintiffs is the CFD's transfer of Carol from IAD to an ambulance assignment. (Complaint ¶¶ 15, 25(a).) The City argues, among other things, that this claim is barred by the statute of limitations. The limitations period for this cause of action is five years. *Anton v. Lehpamer,* 787 F.2d 1141, 1146 (7th Cir.1986). The cause of action accrues when the employee is notified of the employer's intent to take the adverse job action. *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 30, 70 L.Ed.2d 6 (1981); *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). Carol was notified of her transfer in early February, 1982 (Carol Dep. at 492; City 12(e) ¶ 19.) Plain-

tiffs filed suit on March 18, 1987, more than five years later. Accordingly, defendants argue that the action is time-barred.

Plaintiffs chose not to respond to this argument, and the Court thus finds that the City is entitled to summary judgment with respect to plaintiffs' transfer claim.

#### 2. Refusal to Grant Furlough Pay

■ Plaintiffs' second claim is that one or more defendants "refused to grant [Carol] furlough pay after her sick leave in keeping with the procedure followed in other cases as stated in paragraph 20." (Second Amended Complaint ¶ 25(b).) The complaint does not specify which of the defendants allegedly retaliated against plaintiffs by refusing to grant furlough pay to Carol after her sick leave. Although the complaint refers to Paragraph 20 as containing the factual allegations relating to this charge, neither Paragraph 20 nor any other paragraph of the complaint elaborates on the accusation. In their memorandum of law, plaintiffs appear to make this charge only against the Union. (Plaintiffs Mem. at 22–23.) The City states that it was unable to make the payment until the Board determined that payment was proper. The Union states that any delay resulted only because the release of furlough pay is contingent upon the award of a duty disability benefit.

In any event, plaintiffs now concede that Carol eventually received the compensation to which she was entitled. (Plaintiffs Mem. at 23.) The City argues that plaintiffs' claim concerning Carol's furlough pay is moot because Carol ultimately received her furlough pay. Plaintiffs have not responded to this argument, and the Court accordingly finds that this claim is moot.

#### 3. Initial Failure to Promote Plaintiffs and to Give Them Back Pay

The third action challenged by plaintiffs is that one or more of the defendants "initially refused to promote [Carol and Lawrence] to paramedic in charge and then initially refusing [sic] to give them back pay as they had other retroactively promot-

ed paramedics." (Second Amended Complaint ¶ 25(c).) Nowhere does the complaint, plaintiffs' 12(e) statement, or plaintiffs' memorandum of law specify when this initial refusal of promotion occurred, when the refusal to give back pay occurred, or any other details concerning this allegation.

The City argues that there is no evidence that the initial failure to promote plaintiffs was motivated by the promotion lawsuit or the EEOC charges. Indeed, it is difficult to understand how the failure to promote them could have been motivated by the promotion lawsuit, when that lawsuit was itself a reaction to the CFD's promotion methods. The City also argues that the eventual promotion of both plaintiffs and the award of back pay renders plaintiffs' claims moot.

Plaintiffs have not responded to the City's mootness argument, which the Court thus accepts. Plaintiffs similarly have not responded to the causation argument, with the exception of general allegations of bias against plaintiffs on the part of certain officials of defendants, as described *supra* at 26–27. Even if these allegations are accepted, plaintiffs present no evidence that a refusal to promote plaintiffs at some point in time before they were eventually promoted was in retaliation for Carol's EEOC charges or her promotion lawsuit. The Court thus finds that defendants are entitled to summary judgment on this charge because it is moot and because there is no evidence of causation.

#### 4. Denial of Representation

■ Plaintiffs' next claim is that "contrary to policy, the defendant union refused to allow the union attorney to represent [Carol] in her claim against the [Firemen's] Fund." (Second Amended Complaint ¶ 25(d).) The Union raises several arguments in response to this charge.

First, the Union asserts that, notwithstanding the complaint's allegation that its denial of representation was contrary to policy, the Union does not provide or subsidize legal representation for Union members in connection with claims before the Firemen's Fund. (Union 12(e) ¶ 7.) Although plaintiffs argue that the Union has "involved itself or provided representation to members on other issues of significance to the membership" (Plaintiffs 12(e) ¶ 25), plaintiffs do not place in dispute the Union's more specific assertion, which the Court thus credits. *See also supra* at n. 1. Because the denial of representation was consistent with the Union's policy, it cannot be inferred that the reason for the denial was retaliation for Carol's EEOC charges and promotion lawsuit.

The Union also argues that even assuming the denial was contrary to policy, there is no other evidence of retaliatory motive. The Union cites passages from Carol's own deposition in support of this argument. For example, she stated that she had "no way of knowing" whether the EEOC charge was a motivating factor and that aside from her own opinion she was unable to "present any factual evidence, at this time." [3] (Union Mem. at 11.[4]) Plaintiffs' entire response to this argument is as follows:

The transfer of paramedic pension rights to the Firemen's Fund was an issue in the 1982–83 contract. (Ex. 11). The enabling enactment effecting this transfer contained no limitations or qualifications on the receipt of those benefits despite the protestations of union officials in their brief to the contrary. The union lobbied for that law change. Mrs. Herhold was the first paramedic to seek benefits under the new legislation enacted pursuant to the labor contract with the City of Chicago. The union has repeatedly become involved in suits related to promotions, pensions, and invasions of privacy presumably pursuant to a decision by policymakers in the organization. (Ex. 12). Plaintiff has stated that the union attorney agreed to represent her until he was told by this same Mr. Hol-

---

**3.** Plaintiffs have not asserted that they require more time for discovery.

**4.** The Union cites Carol's deposition at 326 but has not provided that page to the Court. However, because plaintiffs have not disputed this characterization, the Court accepts it.

land that he couldn't. *From these circumstances, it can reasonably be inferred that the motivations for this refusal was retaliation.* The plaintiff has adduced proof sufficient to meet her burden that this matter presents a genuine issue of fact.

(Plaintiffs Mem. at 22 (emphasis added).) Despite plaintiffs' conclusory assertion, the Court cannot fathom how "these circumstances" lead to an inference that the Union's motive was retaliation for exercise of First Amendment rights. The only evidence presented in support of plaintiffs' allegation of retaliatory motive is vague opinions and speculation. *Cf. Box v. A & P Tea Co.*, 772 F.2d 1372, 1378–80 (7th Cir. 1985) (summary judgment affirmed where plaintiff unable to present sufficient evidence that actions against her were motivated by sex discrimination), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986); *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1412–13 (7th Cir.1984) (plaintiff unable to prove that his age was motive for termination of employment); *Conroy v. City of Chicago*, 708 F.Supp. 927, 939 (N.D.Ill.1989) (plaintiff unable to present sufficient evidence of racially discriminatory motive).

The Union further contends that even assuming plaintiffs have presented a prima facie case of retaliatory motive, plaintiffs have presented no evidence that the Union's proffered reason for the denial of representation is pretextual. The Union asserts that representation was denied because acceptance of the representation would have presented the attorney with a conflict of interest, as the Union was already advocating a position at odds with that of Carol. As can be seen from the quotation above, plaintiffs make no response to this assertion. Plaintiffs' failure to present any evidence of the illegitimacy of the Union's proffered reason is an independent ground for granting summary judgment to the Union.

5. Delay in Making Back Disability Payments

■ Plaintiffs' next allegation is that the Board miscalculated and refused to pay in a timely manner the back benefits due to Carol from the Firemen's Fund after the Illinois Appellate Court affirmed the Circuit Court's order that the benefits be paid. (Second Amended Complaint ¶ 25(e).) Specifically, plaintiffs contend that as of May 6, 1986 (the date of the Appellate Court decision), the Board owed Carol at least $23,000 in back benefits plus interest, and that the Board repeatedly sent her inaccurate letters and inadequate checks until December 12, 1986, when a final negotiated amount was paid. (Plaintiffs 12(e) ¶ 30.)

The Board maintains that there was a good-faith dispute over the calculation of benefits. Plaintiffs' conclusory response essentially argues that the Board's actions themselves are the evidence of discriminatory motive: "Notwithstanding the Board's self-serving affidavits to the contrary, the most reasonable explanation of the series of actions complained of are those [sic] stated in the amended complaint; that is, that the plaintiffs' assertion of their constitutional rights was and continues to be the motivating factor in the Board's adverse action towards them." (Plaintiff's Mem. at 25.) Aside from plaintiffs' opinion that such retaliation is the "most reasonable explanation," plaintiffs offer no evidence in support of their argument. This type of hypothesis or speculation is insufficient to withstand summary judgment. *See Box v. A & P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir.1985). *See also supra* at 29. The Court finds that the Board is entitled to summary judgment on this issue.

6. Denial of Light Duty Request

■ With respect to the City's denial of a light duty position for Lawrence, the City argues that there is no evidence that the denial was related to Carol's EEOC charges or lawsuits, but rather that the only evidence establishes that the denial was due to the extent of Lawrence's medical problems and the CFD policy concerning light duty. Plaintiffs' response is merely that "[c]ontrary to the City's assertions the record establishes unequivocally

that the City ... denied [Carol's] husband a limited duty position granted to other disabled firemen and paramedics." (Plaintiffs Mem. at 19.) Plaintiffs make no substantial argument that other firemen and paramedics in the same situation as Lawrence have been granted light duty assignments. Although plaintiffs' statement of facts does cite deposition evidence that various personnel given light duty assignments had serious medical problems (Plaintiffs Mem. at 9–10), that evidence shows substantial differences between the situations of those individuals and Lawrence's situation. (*See* Tully Dep. at 20–21, 27–29, 39, 54–56, 58, 73–74.) Plaintiffs present no direct evidence that Lawrence's condition was such as to entitle him to such an assignment. Furthermore, although plaintiffs' factual narrative contains allegations that certain officials of the defendants harbor ill feelings towards Carol, plaintiffs present no specific evidence which tends to show that the denial of a light duty assignment to Lawrence was motivated to any extent by a desire to punish plaintiffs for Carol's EEOC charges and her lawsuits.

Because plaintiffs have presented no evidence from which a jury could reasonably conclude that Carol's exercise of First Amendment rights was a substantial factor in the denial of Lawrence's light duty request, the City is entitled to summary judgment as to this allegation. Alternatively, the City is entitled to summary judgment because plaintiff has presented no evidence which tends to show that the City's proffered reason for the denial was illegitimate.[5]

### 7. Refusal to Arbitrate

Plaintiffs' next charge is that the Union refused to arbitrate a grievance filed by Lawrence to contest the City's denial of his light duty request. (Second Amended Complaint ¶ 25(f).) The Union's position on this issue is incorporated in its argument that plaintiffs have presented no evidence that any of the actions taken by the Union

were performed for retaliatory motives. *See supra* at 29. Plaintiffs' memorandum contains no discussion of the Union's alleged failure to arbitrate a grievance, and the Court concludes that plaintiffs have abandoned this argument. Defendants are therefore entitled to summary judgment as to this allegation.

### 8. Computation of Lawrence's Benefits

■ Plaintiffs' next charge is that the Board has "refused to give Lawrence Herhold ordinary disability benefits based upon his time in service with the Fire Department, but insists that benefits are to be computed contrary to statute based on time of membership in the fund." (Second Amended Complaint ¶ 25(g).) The Board argues that Lawrence's application was a case of first impression regarding the computation of benefits. The Board, based on its understanding that the compromise which allowed paramedics to become covered by the Firemen's Fund was based on an intent that paramedics be treated as new employees, reached a consensus that benefits should be computed as of the date of coverage. The Board litigated this issue up to the Illinois Supreme Court. Furthermore, the Board's members were unaware of Carol's EEOC charges or her promotion lawsuit when the Board considered Lawrence's application and when it decided to appeal the Circuit Court's ruling. (Board 12(e) ¶ 81.) Thus the Board argues that plaintiffs have presented no evidence that the Board's actions could have been taken for retaliatory motives, and alternatively that even assuming such motives, the Board had a legitimate reason for taking its position.

Plaintiffs' brief and conclusory response essentially states that the very number of disagreements between plaintiffs and the Board is evidence that the Board's actions were performed for retaliatory reasons. (Plaintiffs' Mem. at 24–25; *see supra* at 30–31.) Plaintiffs do not explain how retaliation could be the motive when the Board members did not know of Carol's EEOC

---

5. Defendants have also argued that Lawrence does not have standing to bring this lawsuit because the challenged actions are alleged to

have interfered only with Carol's free speech rights and not with any such rights exercised by Lawrence. The Court does not reach this issue.

charges and her promotion lawsuit, and plaintiffs did not respond at all to the Board's argument that its reasons for computing the benefits as of the coverage date were legitimate and not pretextual. In the absence of any more substantial evidence, the Court finds that the Board is entitled to summary judgment on this issue.

### 9. Taxability of Benefits

█ Plaintiffs' final contention is that the Board has "declared Lawrence Herhold's ordinary disability compensation for 1986 to be taxable income contrary to IRS regulations and contrary to their [sic] interpretation of these regulation[s] as stated in its correspondence to him." (Second Amended Complaint ¶ 25(h).) Plaintiffs have apparently abandoned their claim that the declaration of taxability is contrary to the regulations; plaintiffs contend instead that the letter sent to Lawrence was misleading. The Board's primary argument on this issue is that plaintiff can present no evidence that the letter was sent due to retaliatory motives. This argument is based on evidence that all ordinary disability beneficiaries received the same letter, that the letter was prepared by the Board's Accounting Manager without instruction from any Board member, and that the Accounting Manager was unaware of Carol's promotion lawsuit or EEOC charges.

Plaintiffs' response is the same one described in Parts 5 and 8, *see supra* at 29–30, 31 that in light of the number of problems plaintiffs have experienced with the Board, the most reasonable explanation of the Board's actions is retaliatory motives. Again, in the absence of any more evidence than this, the Court cannot allow plaintiffs to present this claim to a jury.

### B. *Policy or Custom*

█ The City additionally contends that it is not liable under § 1983 because the CFD's actions of which plaintiffs complain were not undertaken pursuant to a City policy. It is clear that "municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, 'that is, acts which the munici-

pality has officially sanctioned or ordered.'" *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988), quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). Furthermore, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Id.,* quoting *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300. The plurality in *Praprotnik* held that "identification of policymaking officials is a question of state law," and expressed confidence that "state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* 108 S.Ct. at 924–25. The plurality further emphasized that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 925.

In this case, the City argues that its official policy with respect to the actions challenged by plaintiffs was established by the Mayor and the City Council when, on March 30, 1982, they enacted as an ordinance the Labor Contract between the City and the Union (the "Contract Ordinance"). Section 2 of the ordinance enacting the Contract Ordinance provided: "This Ordinance shall govern and prevail over all ordinances, statutes and rules and regulations contrary to or inconsistent with the terms of this Ordinance." Section 14.1 of the Contract Ordinance provided that although the CFD may determine inherent managerial policy, it must follow the provisions of the Ordinance in doing so. Among other things, the Contract Ordinance stated that "[n]o employee shall be transferred or detailed for punitive reasons" (§ 16.7(F)) and that disciplinary action may be taken only against an employee who fails to fulfill his employment responsibilities (§ 16.2(A)). The City thus argues that the actions alleged by plaintiffs, if true, contravene official municipal policy as established in the Contract Ordinance, which in turn

was enacted by the official with the authority to set final municipal policy—the Mayor and the City Council.

In *Praprotnik*, the Court recognized very limited circumstances in which actions by non-policymaking officials could subject a municipality to § 1983 liability:

> First, ... egregious attempts by local government to insulate themselves from liability for unconstitutional policies are precluded by a separate doctrine.... [A] plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law....
>
> Second, ... the authority to make municipal policy is necessarily the authority to make *final* policy. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

108 S.Ct. at 926 (citations omitted) (emphases in original).

Plaintiffs do not argue that state law does not vest final policymaking authority in the Mayor and City Council or that state law does not recognize the Contract Ordinance as official policy. Nor do plaintiffs argue that the actions they challenge fall within one of the above exceptions—that the actions were taken pursuant to a widespread practice which was so permanent and well settled as to constitute a custom or usage with the force of law, that the actions were performed pursuant to the exercise of constrained discretion, or that the actions were ratified by the City's policymakers. Rather, plaintiffs argue that the Court should look beyond state law to the "realities of municipal decisionmaking" and find that one Commissioner Blair is the final policymaking authority. Plaintiffs premise this argument on the concurrence of Justice Brennan in the *Praprotnik* case, 108 S.Ct. at 928, although plaintiffs characterize their extensive quotation from this concurrence as being from a "majority" opinion by Justice O'Connor which supposedly "rejects" and "criticizes" the plurality opinion. (Plaintiffs' Argument in Opposition at 15.) On the contrary, Justice O'Connor wrote the plurality opinion, and Justice Brennan's concurrence cannot be accepted as the law.[6] This Court will not, therefore, rely on Justice Brennan's opinion, as urged by plaintiffs, to look beyond state law and find that Commissioner Blair's actions constitute City policy or custom.[7] Thus the City is entitled to summary judgment on the alternative ground that plaintiffs have not alleged or argued that the challenged actions were performed pursuant to City policy or custom under the framework adopted by the *Praprotnik* plurality.

Defendants have also raised various other arguments in support of their motion for summary judgment which the Court does not reach.

### V. SECTION 1985(3)

In Count II, plaintiffs claim that defendants engaged in a conspiracy de-

---

6. It should also be noted that Justice Kennedy, who took no part in the *Praprotnik* decision, appears to agree with the plurality's approach, as evidenced by his joinder in Justice O'Connor's majority opinion in *Jett v. Dallas Independent School District*, —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Thus Justice O'Connor's approach in *Praprotnik* appears to command a majority of the Supreme Court.

7. Similarly, were it necessary to reach this issue, the Court could not accept plaintiffs' argument that "[o]bviously, the punitive transfer of an employee for refusing to dismiss a class based lawsuit contesting a promotional policy of the City is an exercise of discretion which reflects a policy of suppressing dissent among employees." (Plaintiffs' Argument in Opposition at 15.) The Court by no means believes it "obvious" that one action inevitably reflects such a policy.

signed to deprive plaintiffs of their First Amendment rights in violation of 42 U.S.C. § 1985(3). Section 1985(3) provides a civil remedy where "two or more persons in any State or Territory conspire or go in disguise on a highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the law ..." To state a cause of action pursuant to § 1985(3), a plaintiff must satisfy four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of either protection and immunity under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any privilege of a citizen of the United States." *United Brotherhood of Carpenters and Joiners of America v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983), citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–103, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). The Supreme Court has made it clear "that the conspiracy not only must have as its purpose the deprivation of 'equal protection of the laws, or of equal privileges and immunities under the laws,' but also must be motivated by 'some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *United Brotherhood*, 463 U.S. at 829, 103 S.Ct. at 3356, citing *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798. The instant case requires the Court to address what is perhaps the most debated issue under § 1985(3)—whether the type of class-based animus asserted in the case falls within the scope of § 1985(3).

As is clear from the above quote, *Griffin* held that racially motivated conspiracies are within the scope of § 1985(3), and left open whether conspiracies motivated by other types of discrimination are actionable. In *Murphy v. Mt. Carmel High School*, 543 F.2d 1189 (7th Cir.1976), the court held that "a § 1985(3) federal cause of action for injury arising out of a purely private conspiracy to interfere with freedom of expression, without state involve-

ment, is not constitutionally supportable." 543 F.2d at 1192. The court also noted:

[The plaintiff] argues that the conspiracy against him was motivated by animus against the non-union employees of the hospital, and that this sufficiently meets the *Griffin* requirement of 'class-based, invidiously discriminatory animus.' The class is small and its constituency dependent on circumstances subject to ready change. Its character is quite different from classes based on race, ethnic origin, sex, religion, and political loyalty. Although we do not reach the question, we doubt whether it fulfills the *Griffin* requirement. We do note, however, that for purposes of § 1985(3), religious groups have constituted a class, *Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir. 1973), as well as supporters of a political candidate, *Cameron v. Brock*, 473 F.2d 608 (6th Cir.1973), and *Richardson v. Miller*, 446 F.2d 1247 (3d Cir.1971), and debtors seeking relief under the bankruptcy laws, *McLellan v. Mississippi Power & Light Co.*, 526 F.2d 870 (5th Cir.1976).

543 F.2d at 1192 n. 1.

In *United Brotherhood, supra*, the Supreme Court returned to the issue which it left open in *Griffin*. The Court first agreed with the Seventh Circuit's holding in *Murphy* that "a conspiracy to violate First Amendment rights cannot be made out without proof of state involvement." 463 U.S. at 832, 103 S.Ct. at 3358. However, the Court left open the question of whether, assuming state involvement, a conspiracy to violate First Amendment rights is within the scope of § 1985(3); it continued to leave open the question of whether § 1985(3) "reaches conspiracies other than those motivated by racial bias." 463 U.S. at 835, 103 S.Ct. at 3359. In particular, the Court left open whether § 1985(3) reaches "conspiracies aimed at any class or organization on account of its political views or activities." *Id.* at 837, 103 S.Ct. at 3360. The Court did hold, however, that § 1985(3) does not extend to "conspiracies motivated by bias towards others on account of their *economic* needs,

status or activities." *Id.* at 837, 103 S.Ct. at 3361 (emphasis in original).

In *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474 (7th Cir.1985), the Court held that § 1985(3) does not extend to employment discrimination based on physical handicap: "Being handicapped is not a historically suspect class such as race, national origin, or sex, nor is the right claimed, employment, a fundamental constitutional right. Thus handicaps differ significantly from classes based on race, national origin, sex, religion and political loyalty that have previously been recognized as *possibly* supporting a § 1985(3) claim." 760 F.2d at 1486 (citations omitted) (emphasis added). As is clear from the word "possibly," the Court did not decide whether § 1985(3) extends beyond racially motivated conspiracies; it decided only that it did not extend to discrimination based upon a disability.

In *Grimes v. Smith*, 776 F.2d 1359 (7th Cir.1985), the Seventh Circuit was directly faced with the issue left open by the Supreme Court in *United Brotherhood*. The court noted that some other circuits had held that "victims of a non-racial political conspiracy may recover under § 1985(3)," but it felt that *United Brotherhood* called these cases into question. 776 at 1366. The court held that § 1985(3) does not reach non-racial political conspiracies, stating that "[s]ince its decision in *Griffin*, the Court has not expressly provided a remedy to a group or class other than blacks. The import of both *Griffin* and *Scott* is that the legislative history of § 1985(3) does not support extending the statute to conspiracies other than those motivated by a racial, class-based animus against 'Negroes and their supporters.'" *Id.*

Although this holding in *Grimes* appears clear, a different panel of the Seventh Circuit reached an inconsistent result in *Volk v. Coler*, 845 F.2d 1422 (7th Cir.1988), without expressly disagreeing with *Grimes*. In *Volk*, the plaintiff alleged that the defendants conspired to retaliate against her because of her opposition to sex discrimina-

tion and sexual harassment which she had experienced. Without substantial analysis of whether § 1985(3) extends beyond racially motivated conspiracies, the court assumed this to be the case and found that the plaintiff stated a cause of action:

> Section 1985(3) extends beyond conspiracies to discriminate against persons based on race to conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty. *Munson v. Friske*, 754 F.2d 683, 695 (7th Cir.1985), citing *Murphy v. Mt. Carmel High School*, 543 F.2d 1189, 1192 n. 1 (7th Cir.1976).[8] ... *Cf. Grimes v. Smith*, 776 F.2d 1359, 1363–67 (7th Cir. 1985) (§ 1985(3) does not cover alleged victims of non-racial political conspiracies).
>
> [W]ith reference to Volk's § 1983 claims, proving a violation of one's right to be free from sex discrimination and sexual harassment does not require proof of discrimination against an entire class of women (or men). Likewise, to succeed under § 1985(3), Volk need not prove that there was an agreement to discriminate against an entire class of women.

845 F.2d at 1434. As the court made clear again later in its opinion, although the plaintiff's claim was based on a First Amendment right in that defendant's motive for retaliation was her speaking out about discrimination and harassment, the court viewed the plaintiff's § 1985(3) claim more as one of conspiracy to discriminate against the plaintiff on the basis of her sex. 845 F.2d at 1435–36.

In *Stevens v. Tillman*, 855 F.2d 394 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989), the court recognized its inconsistent treatment of § 1985(3): "Changing interpretation has been the only constant about § 1985(3). *See Grimes v. Smith*, 776 F.2d 1359, 1363–1366 (7th Cir.1985) (tracing the history); *Volk v. Coler*, 845 F.2d 1422, 1435 (7th Cir.1988) (as if to prove the point, disagreeing with *Grimes*, without discussing it, on statute's coverage of non-racial, political conspiracies)." 855 F.2d at 405. Although

---

8. The cited portion of *Murphy* is quoted *supra* at 34. *Murphy* only recognized that other circuits had extended § 1985(3) in this way, and did not

directly hold that the Seventh Circuit was in agreement.

it did not reach the issue of § 1985(3)'s reach beyond racially motivated conspiracies, the court implied that only racially motivated conspiracies are covered:

As we understand the Supreme Court's contemporary cases, section 1985(3) reaches three kinds of conduct:

1. *racially-motivated* private conspiracies to deprive persons of rights secured to all by federal law....

2. *racially-motivated* private conspiracies to deprive persons of rights secured to all by state law, where the deprivation interferes with the exercise of a federally-protected right....

3. *racially-motivated* conspiracies to deprive persons of rights secured only against governmental action (such as the right of free speech), provided the defendants are either "state actors" or seek to influence the state to act in a prohibited way...."

855 F.2d at 404 (emphases added).

Viewing the Seventh Circuit case law as a whole, it appears fairly clear that § 1985(3) does not extend to politically motivated conspiracies, although in light of *Volk,* this conclusion is not certain. *See also Moats v. Village of Schaumburg,* 562 F.Supp. 624, 631 (N.D.Ill.1983) (Hart, J.) ("a class for purposes of section 1985(3) cannot be composed of those who exercise rights of free speech or association or those who allege infringement of free speech or association rights"); *Feng v. Sandrik,* 636 F.Supp. 77, 84 (N.D.Ill.1986) (Aspen, J.) ("the scope of substantive rights protected through § 1985(3) actions does not include those contained in the First Amendment").

Even if § 1985(3) does extend to certain types of politically motivated conspiracies, it need not extend to a conspiracy to discriminate against a class based on that class' exercise of First Amendment rights. In most instances, courts addressing politically motivated conspiracies refer to a class "such as supporters of a political campaign," *Conklin v. Lovely,* 834 F.2d 543, 549 (6th Cir.1987) (finding that § 1985(3) does extend to discrimination against such a class); *see also Murphy, supra,* 543 F.2d at 1192 n. 1 (referring to discrimination based on political loyalty); *D'Amato, supra,* 760 F.2d at 1486 (same), rather than a

class composed of people who have spoken out on a particular issue. Indeed, courts have emphasized that a "class" for purposes of § 1985(3) is a group of individuals sharing "common characteristics," *Askew v. Bloemker,* 548 F.2d 673, 678 (7th Cir. 1976), that it is a "readily identifiable group," *Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 203 (7th Cir.1985), and that it must be "historically suspect," *D'Amato,* 760 F.2d at 1481–86. Courts have refused to extend § 1985(3) to classes created solely by the action which is being challenged. Thus in *Askew,* the court held that § 1985(3) did not extend to the class of persons whose homes were raided by the defendants in a lawsuit challenging a raid on the plaintiff's home. 548 F.2d at 678. In *Rodgers,* the court held that § 1985(3) did not extend to individuals whose cars were towed without cause by the defendant. *See also Hunziker v. German–American State Bank,* 697 F.Supp. 1007, 1011–12 (N.D.Ill.1988) (Nordberg, J.) (§ 1985(3) did not extend to class of farmers). Although this Court recognizes that a plaintiff need not prove that a defendant discriminated against an entire class of individuals in order to prevail on § 1985(3), *Volk,* 845 F.2d at 1433, it finds that even if politically motivated conspiracies were covered by § 1985(3), they would not extend to a class which is created solely by the actions of the parties in a particular circumstance—here, solely by plaintiffs' own actions in challenging actual or perceived sex discrimination. The Court holds, therefore, that § 1985(3) does not extend to a conspiracy to retaliate against a person or a class of persons based upon those individuals' exercise of their right to speak on a particular issue.

It may be argued that this holding is inconsistent with *Volk, supra,* in which the Court looked beyond the First Amendment issue and treated discrimination against persons speaking out on a particular issue as being discrimination based on that issue itself—in other words, discrimination against persons who spoke out on sex discrimination constituted, in and of itself, discrimination based on sex. If that approach were adopted, and if *Volk* were further to be read as overruling *Grimes,*

*supra*, and surviving *Stevens*, *supra*, and holding that a conspiracy to discriminate against women is actionable under § 1985(3), then the Herholds would state a claim under § 1985(3). This Court declines to follow this reading of *Volk*. In the first place, *Volk*'s vitality is in doubt in light of the other Seventh Circuit cases. More importantly, defendants have made it clear in this case that their § 1985(3) claim is based not on sex discrimination but on discrimination based upon the exercise of First Amendment rights.

Defendants have argued in the alternative that they are entitled to summary judgment on Count II because plaintiff has produced insufficient evidence from which a jury could find that a conspiracy existed. Because the Court has concluded that plaintiffs' allegations of a conspiracy to retaliate against them on the basis of their exercise of First Amendment rights fail to state a claim under § 1985(3), the Court does not reach the issue of the sufficiency of plaintiffs' evidence.

### VI. CONCLUSION

For the reasons described above, defendants' motions for summary judgment are granted.